MORGAN STANLEY HIGH YIELD
SECURITIES, INC., et al.,

           Plaintiffs,

     v.

HANS JECKLIN, et al.,

          Defendants.

Case No. 2:05-cv-1364-RFB-PAL

**ORDER**

## I.    INTRODUCTION

Before the Court are Defendants' Motions for Summary Judgment, and Plaintiffs' Motion for Summary Judgment. ECF Nos. 231, 236, 239, and 321. For the reasons stated below, the motions are GRANTED in part and DENIED in part.

## II.    BACKGROUND

The Morgan Stanley Plaintiffs bring this case alleging that Seven Circle Gaming Corporation ("SCGC") (not a defendant) violated a Note Purchase Agreement ("NPA") when it failed to purchase notes and warrants from Morgan Stanley in the amount of $29,678,269 on August 31, 2000. Plaintiff alleges that SCGC was a shell corporation and that the Defendants orchestrated and profited from the agreement between SCGC and the Morgan Stanley entities. Plaintiffs allege that following the default on the obligation, the Defendants funneled SCGC assets out of the United States to Switzerland. Plaintiffs won a judgment against Seven Circle Gaming Corporation ("SCGC") on December 18, 2003 in the United States District Court for the Southern

District of New York, and now seek to pierce the corporate veil to enforce the judgment against the Defendants in this case.

The original Complaint in this matter was filed on November 29, 2005. ECF No. 1. The case was reassigned to this Court on October 20, 2016. ECF No. 431. The Court held a hearing on pending motions, including the instant motions for summary judgment on March 30, 2017. The Court took the motions for summary judgment under submission and denied without prejudice the remaining motions pending resolution of summary judgment. ECF No. 441.

Plaintiffs have asserted three counts:

Count I – Declaratory Judgment of Alter-Ego Liability Against All Defendants: Pursuant to 28 U.S.C. § 2201(a) that all Defendants were alto egos of SCGC and the 7Circle Entities, as a matter of law.

Count II – Alternatively, Declaratory Judgment of Agency Liability Against Defendants Swiss Parents: Pursuant to 28 U.S.C. § 2201(a) that an agent/principal relationship existed between SCGC and the 7Circle Entitles, and, on the other hand, defendants SLG and JPC, as a matter of law.

Count III – Fraudulent Conveyance against all defendants: Plaintiffs seek declaratory judgment pursuant to N.R.S. § 112.180(1) and Del. Code. Ann. Tit. 6, § 1304(a) voiding the aforementioned transfers of funds and enjoining any further conveyance by the individual Defendants.

Plaintiffs seek an order on all counts permitting and enabling Morgan Stanley to execute the full amount of the SDNY Judgment against defendants, plus post-judgment interest. Plaintiffs seek an order on all counts for costs and attorney's fees.

**III.    LEGAL STANDARD**

Summary Judgment is appropriate when the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, show "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *accord* <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 322 (1986). When considering the

1  propriety of summary judgment, the court views all facts and draws all inferences in the light most

2  favorable to the nonmoving party. <u>Gonzalez v. City of Anaheim</u>, 747 F.3d 789, 793 (9th Cir. 2014).

3  If the movant has carried its burden, the non-moving party "must do more than simply show that

4  there is some metaphysical doubt as to the material facts…Where the record taken as a whole

5  could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for

6  trial." <u>Scott v. Harris</u>, 550 U.S. 372, 380 (2007).

7

8  **IV.  FACTS**

9      The Court has reviewed the facts presented in the motions and responses, as well as the

10  tables of disputed facts presented by Defendant Haeberling and the "Jecklin Defendants" (Hans

11  and Christiane Jecklin, Swiss Leisure Group AG, and JPC Holdings AG).

12      **A.  Jurisdictional Facts**

13      The Court finds the following jurisdictional facts to be undisputed:

14      SCGC's principal and only place of business was in Nevada from 1996 until its dissolution

15  in 2003, the period in which all relevant acts occurred. SCGC's sole corporate purpose was to

16  facilitate building a $340 million hotel/casino in Nevada – the Resort at Summerlin ("the Resort")

17  – which employed approximately 1800 Nevada residents. The Resort at Summerlin was developed

18  and built by a limited partnership, The Resort at Summerlin, L.P., ("RASLP") in which SCGC

19  owned an approximately 70% interest. The general partner of RASLP, The Resort at Summerlin,

20  Inc. ("RAS"), was a wholly-owned subsidiary of SCGC and owned a 1% interest in RASLP.

21  SCGC and its key officers and directors were engaged in gaming activities in Nevada and held

22  Nevada gaming licenses from 1997 to at least 2002. SCGC wholly-owned and held at least six

23  Nevada corporations, all of which operated exclusively in Nevada. SCGC maintained all of its

24  bank accounts at local branches of banks in Nevada.

25      The Note Purchase Agreement was a contract for the sale of debt instruments in the form

26  of Senior Subordinated Payment in Kind ("PIK") Notes, which were held by seven Morgan Stanley

27  investment funds, and were managed and advised by Morgan Stanley Investment Advisors.

28  Morgan Stanley Investment Advisors is located in New York City. The NPA was negotiated by

Matt Shulkin on behalf of Plaintiffs. Shulkin was based in New York City. Peter Avelar of Morgan Stanley signed the NPA on behalf of Plaintiffs. He was located in NYC in the same office as Shulkin.

Defendant Tipton negotiated and signed the NPA on behalf of SCGC. From the time Mr. Shulkin began working at Morgan Stanley until the Resort filed for bankruptcy, Defendant Tipton met with Mr. Shulkin at least once a year. These meetings included more than three in-person meetings in New York over the course of several years. Except for one meeting in Nevada, all of Mr. Tipton's meetings with Mr. Shulkin took place in New York City, most often at Mr. Shulkin's office. Mr. Shulkin, based in New York City, initiated contact with SCGC regarding SCGC purchasing Morgan Stanley's notes. Mr. Tipton hired Salomon Smith Barney ("SSB") in New York City to serve as a broker to facilitate the sale and purchase of the securities subject to the NPA. Morgan Stanley's legal counsel at the time of the negotiation and drafting of the NPA was Mayer Brown & Platt, in the person of Nazim Zilkha. During that time Mr. Zilkha was located in New York City. Mr. Avelar signed the NPA on behalf of Morgan Stanley while in New York City. Plaintiffs filed a lawsuit against SCGC for the breach of the NPA in New York.

### B. General Undisputed Facts

The Court finds the following facts to be undisputed:

#### 1. The Parties and Relevant Entities

During the relevant period, Plaintiffs were seven (7) investment funds (the "Plaintiff Funds") owned by members of the investing public (including, inter alia, pension funds, individual investors and retirement plans) that were governed by a number of specific "investment objectives, policies and restrictions" (collectively, "Investment Objectives"), which their boards of trustees or directors were responsible for implementing. To manage their day-to-day affairs, the Plaintiff Funds, by vote of their shareholders and boards of directors/trustees, entered into a management agreement with an investment advisor and administrator, Morgan Stanley Investment Advisors ("MSIA"), on an annual basis.

At all times MSIA reported to each Plaintiff's board of directors/trustees and shareholders, and had no authority to depart from Plaintiff's Investment Objectives. MSIA was at all relevant times a wholly-owned subsidiary of Morgan Stanley & Co., a publicly-traded corporation. As manager, MSIA acted as Plaintiffs' investment advisor and administrator to, among other things, pursue investments, manage the Plaintiff Funds' portfolios to ensure they fulfilled the objectives of each Plaintiff Fund, and file annual reports on behalf of each Plaintiff Fund. At no relevant time did any of Morgan Stanley & Co., MSIA, their affiliates or subsidiaries own shares in any of the Plaintiff Funds.

SCGC, during the relevant period (1998 to 2003), was a Delaware company operating in Las Vegas, Nevada. SCGC was majority-owned by Defendant SLG, a Swiss company based in Zurich, and its minority shareholders included Defendants George Haeberling and John Tipton. SCGC's board members included Defendants Hans Jecklin, Christiane Jecklin, George Haeberling and John Tipton. For portions of the relevant period, Tipton was SCGC's CEO, president, CFO, secretary, treasurer and general counsel.

During the relevant period, Defendant SLG was majority-owned by another Swiss company based in Zurich, Defendant JPC. Defendants Hans Jecklin, Christiane Jecklin and Haeberling were members of SLG's board of directors. Haeberling resigned from SLG's board in March of 2002. Also during the relevant period, Hans and Christiane Jecklin owned 75% and 25% of JPC, respectively. Hans Jecklin, Christiane Jecklin and Haeberling were also on JPC's board of directors. Haeberling resigned from JPC as well in March 2002.

In 1992, SCGC formed a subsidiary, Seven Circle Resorts, Inc. ("SCR"). SCGC transferred its principal place of business from Easton, Maryland to Denver, Colorado, and hired a number of Denver-based executives to run SCR and SCGC, including Tipton as general counsel. At that time, Hans Jecklin also added Haeberling and Tipton to SCGC's board of directors.

While SCGC was increasing its board membership, it also adopted expanded by-laws, which, *inter alia*, provided for the following:

> Number of Directors. "The board of directors, by resolution, may increase or decrease the number of directors from time to time. * * * [E]ach director shall be elected

at each annual meeting of stockholders and shall hold such office until the next annual meeting of stockholders and until his successor shall be elected and shall qualify. No decrease in the number of directors shall have the effect of shortening the term of any incumbent director." (Article III § 1.)

Place of Board of Meetings. "The regular or special meetings of the board of directors or any committee designated by the board shall be held at the principal office of [SCGC] or at any other place * * * that a majority of the board of directors * * * may designate from time to time by resolution." (Article IV § 1.)

Notice of Special Board Meetings. "[W]ritten notice of each special meeting of the board of directors * * * shall be given to each director * * * not less than one (1) day prior to the time fixed for the meeting." (Article IV § 4.)

Informal Action by Directors. "[A]ny action required * * * to be taken at any meeting of the board of directors * * * may be taken without a meeting if all members of the board * * * consent to the action in writing, and the written consents are filed with the minutes of proceedings of the board[.]" (Article IV § 9.)

Compensation of Officers. "The compensation of * * * employees of [SCGC] may be fixed by the board of directors * * * or by an officer to whom that function has been delegated by the board." (Article V § 4.)

President. "The president shall be the chief executive officer of [SCGC] and shall have general supervision of the business of [SCGC]." (Article V § 7.)

Delegation of Officers' Duties. "Whenever an officer is absent, or whenever, for any reason, the board of directors may deem it desirable, the board may delegate the powers and duties of an officer to any other officer or officers or to any director or directors." (Article V § 11.)

## 2. **The Resort Project**

SCGC was formed and incorporated in Delaware in 1988, with a principal place of business in Easton, Maryland. In 1996, Hans Jecklin sought to develop a resort and casino in the Summerlin area of Las Vegas, Nevada. The Howard Hughes Company ("Howard Hughes") owned six (6) parcels that were zoned for gaming in the Summerlin Community (the "Gaming Parcels"). The Gaming Parcels were among the "few remaining pieces of property exempted from certain legislation (Senate Bill 208) passed by the Nevada legislature to restrict the development of local resort casinos/hotels."

In August 1996, SCGC's subsidiary, RASLP, purchased one (1) of the six (6) Gaming Parcels, a fifty-five (55) acre property known as "RAS1" with fresh funds from SCGC. On the same day, RASLP and Howard Hughes entered into a royalty agreement ("Royalty Agreement"), whereby RASLP agreed to pay Howard Hughes an annual royalty fee of $1,000,000 in exchange

for, *inter alia*, the right to purchase the remaining five (5) Gaming Parcels in the event that Howard Hughes determined to make the Gaming Parcels available for development ("Rights of First Offer").

SCGC's wholly-owned subsidiary, RAS raised capital through a public offering to fund construction of the Resort. Specifically, in December 1997, after obtaining the requisite gaming licenses from the Nevada Gaming Control Board to build the Resort, RAS raised $200 million by issuing to the public $100 million in secured first mortgage notes ("First Mortgage Notes") and $100 million in unsecured senior subordinated notes ("Senior Subordinated Notes"). RAS thereafter entered into a credit agreement ("Credit Agreement") with the First Mortgage Note holders and an indenture agreement ("Indenture Agreement") with the Senior Subordinated Note holders to govern the terms of repayment. In early 1998, Plaintiffs purchased approximately $40 million of the Senior Subordinated Notes, which are the subject of the August 2000 NPA. In an entirely unrelated transaction, MS Senior Funding Inc. ("MS Senior Funding"), which was not affiliated with the Plaintiff Funds, purchased First Mortgage Notes.

In 1998, the Jecklins moved from Maryland to a home outside of Las Vegas, known as "Eagle Rock," to oversee development of the Resort.

### 3. The Note Purchase Agreement

In May 2000, John Tipton contacted Plaintiffs and offered to have SCGC or an affiliate purchase their notes at a discount of approximately $0.70 on the dollar. After some negotiation over the course of May and June 2000, Tipton and Plaintiffs agreed to a price for the notes of $0.74 on the dollar. Thereafter, Tipton drafted the NPA, according to which Plaintiffs' notes were to be purchased on July 31, 2000. Through several rounds of drafts, the buyer in the draft NPA was changed, initially from JPC to SLG, and subsequently, from SLG to SCGC.

Just before the scheduled execution of the NPA by Plaintiffs and SCGC, SCGC requested that the closing be extended by one month. In consideration for the extension, SCGC offered to pay Plaintiffs an additional $0.02 on the dollar. Plaintiffs agreed to the extension, and on August 3, 2000, the parties signed the NPA, pursuant to which SCGC would purchase Plaintiffs' notes for $0.76 on the dollar, namely $29.7 million, on August 31, 2000.

### 4. **Default on the Note Purchase Agreement and Abandonment of the Resort Project**

On August 30, 2000, Wolfgang Gross, the Chief Financial Officer of Defendants SLG and JPC, sent a memorandum to Hans Jecklin recommending that "exit strategies" be reviewed. On August 31, 2000, Gross sent a further memorandum stating that SCGC and Swiss Casino Holdings AG had a combined total of approximately 1.8 million at their disposal, while "the entire financial need . . . of the resort is over $100 million." He further recommended that funds not be used for repayment of debt principal in the United States, and that the "warning process" triggered by nonpayment would provide time to "define the necessary communications and exit strategies." On September 1, 2000, SCGC informed SSB that it would not be funding the purchase. SSB returned the Notes to the Funds.

Defendants' "business consultant," Dr. Ulrich Richard, produced an internal memorandum dated October 24, 2000, stating that Plaintiffs were owed the purchase price of approximately $30 million. In an earlier memo dated October 12-18, 2000, Defendant George Haeberling had recommended that Tipton "prepare" the transfer of the Jecklin's "private house," Eagle Rock, and cars to their sons.

In a legal memo dated August 21, 2001, Haeberling warned of litigation risks. Specifically, he wrote the following:

> "Within the framework of these proceedings, the plaintiffs want to expose everything that can be interpreted as culpable conduct by the officers. There are unfortunately more than enough suitable examples, such as the following: 4th Amendment to the credit agreement (Morgan Stanley / Hunter); Options with Howard Hughes for the five casino parcels: transfer of the rights from RAS to SCRE; Preference payments prior to the beginning of Chapter 11 (incl. lease payments to SCA); Other instances of preferential treatment of insiders (for example, lease contracts with Gustav); "improper" or "fraudulent" management prior to the beginning of Chapter 11;

He further warned:

> "Plaintiffs will aim their guns primarily at JT (due to his dual role as chief officer of the corporations involved and as "architect" and "foreman" of all of the sets of contracts) . . . the door will be opened for the plaintiffs' piercing of the corporate veil to reach SLG (formerly SCH) . . . The fact that, with increasing difficulty on the part of the resort, an increasing number of Swiss "top shots" were flown in, some of whom engaged in more

than mere analysis or consulting will be played up and exploited . . . [John Tipton] will in effect facilitate the pricing of the corporate veil. Such piercing of the corporate veil cannot in any way be ruled out at this point in time."

### 5. **Additional Memoranda and Minutes**

In a confidential memo dated October 12-18, 2000, Defendant George Haeberling included a section entitled "Boards (especially SOA, RAS, Inc.). Under "measures," he notes that he (Haeberling) would take over the Swiss representation on site at least until the Ch. 11 procedure is completed. The memo further reads as follows: "Framework conditions: . . . [George Haeberling] is on site 2 weeks per month; no important decisions without previous consultation with [Hans Jecklin] and "Hans Rihs"; [John Tipton] reports to [George Haeberling.]."

December 12, 2000 minutes for Swiss Casino Holdings, AG ("SCH") (another name for Defendant SLG), for a meeting at which, according to the minutes, Haeberling and the Jecklins were present, occurring two weeks after Haeberling "resigned from all of the other U.S. entities on whose boards he had been serving," in order "to avoid potential conflicts of interest," state that "Hans Jecklin proposed that a USA task force ("de facto board" be designated with Dr. Schweizer, Dr. Haberling [sic], Martin Egli (Swiss Partner), Christa Jecklin and himself, because he sees an urgent need for action for further decisions." The same minutes dated December 12, 2000 for Swiss Casino Holdings AG state that Haeberling was present as a "delegate" and that Haeberling was tasked by the board with "investigating whether, and the extent to which, the funds arising from the land sale in the U.S. can be transferred to Switzerland."

### 6. **Allegedly Fraudulent Transfers**

Defendants maintained two sets of board minutes for the same company, Seven Circle Real Estate Company, for a meeting on the same date at the same time and in the same place, February 4, 2001 at 6:00 p.m. in Zurich, Switzerland. The first bears a time stamp from what appears to be a record of a fax, with the date February 8, 2001, and a telephone number beginning in 41, the dialing code for Switzerland. The second set do not contain any indication of a date. The first document states that "the **only item of business** was a discussion of the potential to lend certain sums of money from the Corporation to either Hans Jecklin personally or to Tivolino, A.G. The

amount to be lent was determined to be ten million dollars for a one-year period at an interest rate of twelve percent per anum," which would be secured by stock holdings. The second set of Board Minutes state that "*the only item of business* was a discussion of the repayment of those certain promissory notes between SCRE, SCA, and SCR, Inc., dated March 31, 2000," and describe how the loan was intended to ultimately repay UBS for funds that SLG had purportedly borrowed from UBS in connection with building the Resort. Both documents are signed by the Jecklins and note that "the director absent was John Tipton," who did not sign either. Tipton testified that he reviewed, edited, and approved these minutes.

### C.  Disputed Facts

The Court finds the following additional facts to be supported by disputed evidence:

#### 1. The Resort Project

In 1998, the Jecklins moved from Maryland to a home outside of Las Vegas, known as "Eagle Rock," to oversee development of the Resort. SCGC, with certain of its subsidiaries, purchased the Jecklin's home with money that was intended for the Resort's construction costs. The Jecklins, also at SCGC's expense, made a number of renovations and additions to Eagle Rock, including extensive landscaping, installing customized marble European-style bathrooms, and building an expensive pool. In addition, SCGC purchased a private golf membership for Hans Jecklin's "personal golf use."

To attend to matters locally, the Jecklins hired, at the expense of SCGC's subsidiary, housekeeper Sofia Mejia. Mejia's responsibilities included "clean[ing] the house," picking up and dropping off the Jecklin family's dry cleaning, and stocking the kitchen. In addition, Mejia purchased and sent luxury items to the Jecklins' relatives on their behalf, including, for example, chocolates to a relative in British Columbia. At no time did Mejia ever provide any services to RAS or any of its affiliates. In 1999 the Jecklins sold "Southerly Farm," a 65-acre residence in Maryland purchased by SCGC, for approximately $2 million. The proceeds were transferred to an account "in Switzlerland."

In addition to the debt financing, RAS also received equity investments through SCGC, which eventually totaled approximately $144 million. SCGC funded those equity investments by borrowing $150 million from its Swiss parent, SLG, pursuant to a series of loan agreements because SCGC generated no revenue of its own. Under the loan agreements, SCGC was required to make monthly interest payments to SLG.

As a majority shareholder of RAS, SCGC, as well as its shareholders, directors and officers, were subject to regulation by the Nevada Gaming Commission and Nevada Gaming Control Board (collectively, "Nevada Gaming Authorities"). Specifically, the Nevada Gaming Authorities were required to "investigate any individual [and/or corporation] who ha[d] a material relationship to, or material involvement with, [RAS]." In view of the fact that Hans Jecklin, Christiane Jecklin, Haeberling and Tipton were materially involved in the development, construction and operation of the Resort, each petitioned for, and obtained, Nevada gaming licenses.

A number of factors contributed to substantial construction delays of the Resort. Defendants hired Swiss advisors to advise SCGC and its subsidiaries, "transmit [Hans Jecklin's] decisions," and convey his objectives. Mr. Haeberling suggested in a communication to Sean McGuiness that Hans Jecklin "is in charge of all aspects of our U.S. business."

In February 1999, for example, Hans Jecklin, chairman of SCGC's board of directors, informed the board by memorandum that Hans Ziegler, his personal Swiss advisor, would act as his representative, would "transmit his decisions," and would attend all board and directors' meetings. Among the "agreed upon objectives for Hans Ziegler as Jecklin's representative, would be: "project budget and timetable," "financing," and "operating budget."

Beginning in June 1999, Haeberling and Gross began traveling regularly to Nevada. They helped to "oversee operations," and "streamline relations and reconcile problems." In particular, they took part in meetings at which certain issues were to be "discussed and decided." These included "milestones" for the completion of construction of the Resort, and implementation of an "urgent costcutting program," and "financial engineering for dramatic shortfall to be expected."

In mid-1999, Hans Jecklin added another Swiss advisor, Ernst Brugger, to SCGC's board to oversee construction of the Resort and assist Hans Jecklin in firing officers and removing directors that were not sufficiently solicitous of the Swiss point of view. For example, in late 1999, and without the required shareholder and board approval, Hans Jecklin and Brugger held a private meeting with McMullan and instructed him to fire Jim Fonseca and Quinton Boshoff from their positions at SCGC and its subsidiaries, without notification to or the authorization of SCGC's board of directors. After McMullan fired Boshoff and Fonseca, Hans Jecklin and Brugger summoned him to a meeting in Switzerland, where they advised McMullan that they had removed him, in addition to Boshoff and Fonseca, from SCGC's board of directors, and requested that he resign as president and CEO of SCGC, again, without the requisite authorization from SCGC's shareholders and board of directors.

Following the termination of McMullan, Fonseca and Boshoff, Defendants inserted SLG's and JPC's CFO, Wolfgang Gross, as a senior authority of SCGC and its subsidiaries, whose decisions "should be considered as decisions made by Mr. Jecklin." Gross had not been elected to any of those positions, did not report to any officers of SCGC or its subsidiaries, was not compensated by SCGC or any of its subsidiaries, and did not hold a Nevada gaming license. Gross was to spend "at least fifty percent of his time" on the project of building the Resort. Gross regularly attended the board meetings of SCGC and its subsidiaries and made financial decisions on their behalf.

By 2000, the nominal officers of SCGC and its subsidiaries had been stripped of the authority to approve any and all payments; "[a]ny expense [of SCGC or any of its subsidiaries], small or large" was to be approved by Tipton, and one of Hans Jecklin, Gross or Brugger.

In January 2000, Howard Hughes notified RAS that it was offering for sale a Gaming Parcel known as "RAS2" for approximately $30 million, which required RAS to exercise, or decline to exercise, one of its Rights of First Offer. Because RAS did not have the financial wherewithal to purchase RAS2, RAS assigned its Right of First Offer to SCGC with the understanding that "[a]ny interest retained by SCGC in [RAS2] development and any other

economic benefit from [RAS2] [would] be shared [with RAS]." RAS retained the Rights of First Offer with respect to the four (4) remaining Gaming Parcels.

Upon obtaining the Right of First Offer for RAS2, SCGC formed a wholly-owned subsidiary, Seven Circle Real Estate Company ("SCRE") for the sole purpose of purchasing RAS2. To pay for RAS2, SCRE borrowed from a number of sources, including $10 million from SCGC. To fund that loan, SCGC, in turn, borrowed $10 million from SLG. On January 18, 2000, SCRE purchased RAS2.

### 2. **The Note Purchase Agreement**

Hans Jecklin, with the assistance of his Swiss advisors, Tipton, and Gross, took "the lead in all the decision making [related] to [the] turnaround" of the Resort, though neither the SCGC board nor the RAS board had granted them such powers. The Resort continued to "drift[] towards collapse." In an effort known as "Project Black Jack," SSB recommended a restructuring that included SCGC and its affiliates retiring as much debt as possible at a discount. Despite the fact that SCGC's debts substantially exceeded its assets, SCGC took SSB's advice and started to retire debt at a discount in early 2000.

### 3. **Default on the Note Purchase Agreement and Abandonment of the Resort Project**

RAS transferred $2.9 million in cash to SCGC's account so that SCGC could pay PDS Gaming Corporation ("PDS"), a company that leased gaming equipment to the Resort and in which the Jecklins had personally invested, the entire amount it was owed by RAS. In 2004, PDS hired Tipton as its general counsel. Days after RAS filed for bankruptcy on November 21, 2000, and upon learning of these payments, the creditors' committee, on behalf of debtor, and Wilmington Trust Company, on behalf of the First Mortgage Note holders, filed suit against SCGC, PDS, and others to recover the $2.9 million ("PDS Litigation"). In March 2002, the parties settled the PDS Litigation as part a larger settlement agreement.

In mid-August 2000, SCGC hired SSB to act as its broker to purchase Plaintiffs' notes. Gross calculated that even with a successful restructuring of RAS's debt, which would include the

1  purchase of Plaintiffs' notes on August 31, 2000, the Resort would still require an additional $108

2  million to continue operating.

3      The Jecklins divested themselves of assets held in the United States. Among other things,

4  they planned to direct Tipton to prepare the legal papers necessary to transfer certain of the

5  Jecklins' private assets in the United States to their sons.

6      Without regard to the governing by-laws and in contravention of other corporate

7  formalities, SCGC and its operating entity, SCR, pared down their number of board members to

8  include only the four individual Defendants. For example, on September 6, 2000, SCGC—as

9  evidenced by a memorandum signed only by Hans Jecklin, as chairman of the sole shareholder,

10  SCA, A.G.—elected Hans Jecklin, Tipton and Haeberling as directors of SCR to eliminate the

11  only non-Defendant board member, Brugger. Similarly, on November 8, 2000, the Jecklins and

12  Tipton appointed themselves SCGC's only board members, thereby eliminating non-Defendants

13  Peter Meier (a director on the boards of SLG and JPC), Bud Hicks (a Nevada attorney), and Chris

14  Brady (an unrelated Swiss businessman), again in violation of SCGC's by-laws.

15      In October 2000, Hans Jecklin hired Ulrich Richard, another Swiss advisor, to act on his

16  behalf in Las Vegas. In particular, Hans Jecklin tasked Richard with evaluating whether SCGC,

17  and in turn, SLG, could recover any funds from RAS before the Resort filed for bankruptcy. For

18  example, Richard, with the assistance of Haeberling, analyzed whether SCGC would be able to

19  send $1,875,000 (funds set aside by SCGC for a down payment on the purchase of RAS2), "to

20  Switzerland." Richard, in reporting the results of this analysis, stated that: "if SCGC sends the

21  remaining $1,875,000 to Switzerland, then it will immediately run out of [funds]," which, in

22  Richard's opinion, left the Jecklins "no other choice but to wait for two months or so to see whether

23  [they could] actually sell [RAS2]." Richard was terminated. Haeberling was tasked by the board

24  of SCH (now SLG) with continuing to "investigat[e] whether, and the extent to which, funds

25  arising from the [RAS2] sale in the U.S. [could] be transferred to Switzerland."

26

27      4. **Allegedly Fraudulent Transfers**

28      Tipton pursued negotiations with Howard Hughes to obtain approval for an expedited sale

- 14 -

of RAS2. Tipton represented that SCGC would use the proceeds from a sale of RAS2 to gain additional liquidity to keep the property open and running," which was in Howard Hughes's interest due to its ongoing interests in the property and surrounding development.

Tipton offered, without obtaining requisite board approval or notifying RAS, to relinquish RAS's four (4) remaining Rights of First Offer. He claimed the rights had a value of $2 million. Tipton helped to arrange the sale with only days to spare. Namely, RAS filed for bankruptcy a mere six (6) days after SCGC had sold RAS2 to a competitor on November 14, 2000 for $42 million.

SCGC failed to use any of the $15 million in net proceeds from the sale of RAS2 to fund the Resort. Instead, upon receipt of the $15 million in cash, as set forth in detail below, SCRE, on SCGC's behalf, sent $10 million to Hans Jecklin's personal bank account for, *inter alia*, construction of another lavish private home in Switzerland, and $5 million to legal counsel for anticipated bankruptcy-related expenses.

In November 2000, a Swiss affiliate of SLG, TMI Holding Services AG, intended to charge SCR (SCGC operating entity) monthly "rent" (in the amount of approximately US $5600) for Eagle Rock on a going-forward basis and retroactively from January 1, 1999. Because SCR had already been making the monthly mortgage payments, the CFO of SCGC and SCR, Gary Charters, protested that the rent invoices were an inappropriate "double charge." Gross summarily dismissed Charters' concerns, ordered him to sign off on the payments, and directed him to address any further concerns on this issue directly with Hans Jecklin. Accordingly, SCGC's subsidiary intended to make monthly mortgage payments of $5500 a month and monthly rental payments of $5600 a month on the same personal residence of the Jecklins to a subsidiary of SLG.

a. ***Transfer of $946,335 from SCGC to SLG Holding Services AG on June 21, 2001***

On January 30, 2001, SLG's affiliate, SLG Holding Services AG, issued an invoice on behalf of SLG to SCR in the amount of $946,335 for purported "expenses related to [SCGC and its subsidiaries]." However, that invoice failed to provide adequate supporting documentation for SCGC's CFO, Charters, to approve payment. The backup documentation that was provided by

SLG . . . consisted mostly of receipts for flights to Nevada for the spouses of SLG and JPC executives, the Jecklins' children, friends and extended family of the Jecklins, Clark and her husband, none of whom were officers or directors of SCGC or its subsidiaries. Therefore, Charters could not "properly" book the charges. However, Gross and Kenel rebuffed Charters's request. Hans Jecklin, Tipton, or Haeberling caused SCGC to pay the invoice. Moreover, Gross instructed Charters to book $500,000 of the $946,335 "as an interest payment or capital repayment" to SLG from SCGC, and the remaining amount as a payment for "management services" without any specifications as to what services were rendered or which company purportedly received those services.

### b. *Transfer of $1,325,000 from SCGC to SLG Holding Services AG on July 16, 2002*

On July 11, 2002, SCRE received a $1,492,523 settlement payment from Marsh in connection with the construction of the Resort. On July 12, 2002, Hans Jecklin sent Tipton a fax directing him to transfer $1.325 million from SCRE's account to SCGC's account, to allow SCGC to make another purported "interest payment" to SLG. On July 16, 2002, without any concurrent board authorization or resolution, Tipton complied, wiring $1.325 million from SCGC to SLG and recording the transfer as an "interest payment" by SCGC.

### c. *Transfer of $1,300,000 from SCGC to JPC on February 20, 2002*

On January 31, 2002, SCGC received $1.8 million in connection with a settlement of certain litigation with J.A. Jones. On February 8, 2002, the Jecklins purportedly held a series of board meetings in Zurich, at fifteen-minute intervals, for SCGC, SCRE and SCR, during which they directed that $1.3 million be sent to SLG "as quickly as possible." Tipton did not "attend" these meetings, although he prepared the minutes and board resolutions. Holding these meetings without notice to Tipton violated Article IV § 4 of SCGC's by-laws, which required notice of at least one day for board of director meetings.

The SCR board minutes state that the Jecklins approved the loan "to SCGC for the purpose of repaying certain borrowings to SLG and providing operating capital to SCGC," although SCGC

was not an operating company. In contrast, SCGC's board minutes state that this transfer was an interest payment from SCGC to SLG, even though SCGC had not made an actual interest payment for nearly three years, namely since April 1999. Finally, SCRE's board minutes state that the transfer "would be in the best interests of [SCRE] since continued funding of [SCRE] for future projects is contingent on maintaining the funding sources from SLG and SCGC." Moreover . . . Christiane Jecklin, on February 13, 2002, directed SCGC to wire the $1.3 million to JPC notwithstanding the board minutes which stated that the payment should be made to SLG. Nor is there evidence that SCGC retained any portion of the funds for "operating capital," in further disregard of the SCR board minutes.

### d. *Transfer of $425,000 from SCGC to JPC on March 11, 2002*

On February 15, 2002, SCGC received a check for $441,665 from Fireman's Fund, one of its insurers, "as a premium return discovered during [an] audit" of SCGC's account. On March 11, 2002, SCGC transferred $425,000 of $441,665 to JPC. Moreover, SCGC accounted for the transfer as an "interest payment" to SLG, rather than JPC, the entity that actually received the funds.

### e. *Transfer of $1,200,000 from SCGC to JPC on May 21, 2002*

On May 14, 2002, SCRE received an additional $1,294,887 from the settlement of claims against J.A. Jones. On May 17, 2002, without any board meeting, SCRE transferred $1.2 million of that $1,294,887 to SCGC which, on that same day, transferred the full $1.2 million to JPC. Once again, SCGC recorded the transfer on its books as an interest payment to SLG, rather than a payment to JPC, which actually received the funds.

### f. *Transfer of $10,000,000 from SCRE on behalf of SCGC to Hans Jecklin, JPC, or SLG, on February 8, 2001*

In February 2001, Tipton directed SCGC's outside counsel, McDonald Carano Wilson McCune Bergin Frankovich & Hicks LLP, to draft a loan agreement to document the transaction, whereby Hans Jecklin was required to "fully secure[]" the loan with his stock holdings in JPC, pay

an interest rate of 12% annually, and repay SCRE within one year. There is no evidence that this agreement was ever signed. In addition, Tipton testified that he received board meeting notes from the Jecklins, which he "cleaned up" and put in the form of the board meeting minutes. The Jecklins signed the minutes, which reflect a purported SCRE board meeting that the Jecklins allegedly held, at which the "loan" was authorized ("First Set of Board Minutes"). This meeting, if it occurred, was held in Zurich. Although he was a director, Tipton did not attend or sign. Tipton's prior knowledge or consent was required by SCRE's by-laws. At no time did Hans Jecklin either pledge any JPC stock to secure this purported loan or make any interest payments thereon. Moreover, Hans Jecklin never repaid any portion of the $10 million to SCRE.

On November 1, 2001, RAS's pre-petition and post-petition lenders filed an *ex parte* application to the Bankruptcy Court requesting an order that SCGC and SCRE produce, *inter alia*, documents reflecting "the transactions between SCGC and/or its affiliates and Debtors and/or their affiliates, and any matters which affect the administration of the estate." On November 1, 2001, the Bankruptcy Court granted the application, ordering SCRE and SCGC to produce the requested documents on November 15, 2001.

On November 9, 2001, Defendants, reversed all accounting entries reflecting a $10 million loan to Hans Jecklin and devised a new rationale for this transfer which had been made nine months earlier. Instead of booking the $10 million transfer as a loan from SCRE, made on behalf of SCGC, to Hans Jecklin, SCRE and SCGC altered their books and records to now show the transfer as (i) a $10 million loan repayment by SCRE to SCGC and then (ii) a $10 million loan repayment by SCGC to SLG. The justification for this was to allow SLG to repay a purported $10 million loan it owed UBS. Moreover, this eliminated a $10 million receivable from SCRE's balance sheet.

While not set forth in the board minutes, the purported justification for transferring the $10 million directly into Hans Jecklin's personal account, and not to an SLG account, have varied. John Tipton represented that it would have taken too much time to transfer funds from account to account, and Hans Jecklin claimed that the reason for transferring the funds directly to his personal account, and not to an SLG account, was to retain leverage in renegotiating SLG's purported loan with UBS.

**g.** **Transfers of $117,757.70 from SCRE on behalf of SCGC to Tipton on March 8, 2002; and of $71,292.73 from SCRE on behalf of SCGC to Tipton on July 16, 2002**

Tipton received payments from SCGC, whenever SCGC and its subsidiaries recovered funds through settlement of the various litigations, pursuant to an undisclosed "sharing agreement" between Tipton and the Jecklins. These payments were in addition to Tipton's yearly salary of $325,000 and an annual bonus of $100,000.260. Specifically, Tipton received the following:

    a.) March 8, 2002 -- payment from SCRE, on behalf of SCGC, to Tipton totaling $117,757.70; and

    b.) July 16, 2002 -- payment from SCRE, on behalf of SCGC, to Tipton totaling $71,292.73.

Although a memorandum memorializing this "sharing agreement" was drafted, and Hans Jecklin and Tipton signed that agreement, at no time did Tipton or the Jecklins ever raise the matter at any SCGC board meeting, let alone obtain a board resolution, as required by SCGC bylaw Article V § 4.263.

### 5. Eagle Rock Expenses

After the Jecklins left Nevada in 2002, Eagle Rock was sold. Upon identifying a buyer, and with at least some direction from Tipton, Clark and Mejia assisted Christiane Jecklin in packing the Jecklins' personal items. In addition, Tipton's assistant, Sheila Waid assisted Clark by hiring a shipping company to send the Jecklins' household items, including custom-made toilets, back to the Jecklins' private home in Zurich. With respect to the personal household items that the Jecklins decided to leave behind, Christiane Jecklin instructed Tipton to arrange for storage in Nevada and to have SCGC pay the monthly storage fees. SCR continued to make the Jecklins' mortgage payments directly to the mortgage company until Eagle Rock was finally sold in 2003. Moreover, SCR wired at least some of the proceeds to the Jecklins' personal bank account in Zurich. SCGC and SCR did not receive any portion of these sale proceeds.

## V. DISCUSSION – FRAUDULENT TRANSFERS

As the Court's finding as to the fraudulent transfers informs its findings as to alter ego and agency liability, the Court first addresses the eight fraudulent transfers asserted in this case. Plaintiffs have dismissed these claims against Defendant George Haeberling only.

### A. Legal Standard

#### 1. Fraudulent Transfers

Nevada Revised Statute ("NRS") §112.180 provides:

1. A transfer made or obligation incurred by a debtor is fraudulent as to a creditor, whether the creditor's claim arose before or after the transfer was made or the obligation was incurred, if the debtor made the transfer or incurred the obligation: (a) With actual intent to hinder, delay or defraud any creditor of the debtor; (**Fraud in Fact);** or (b) Without receiving a reasonably equivalent value in exchange for the transfer or obligation, and the debtor: (1) Was engaged or was about to engage in a business or a transaction for which the remaining assets of the debtor were unreasonably small in relation to the business or transaction; or (2) Intended to incur, or believed or reasonably should have believed that the debtor would incur, debts beyond his or her ability to pay as they became due.

2. In determining actual intent under paragraph (a) of subsection 1, consideration may be given, among other factors, to whether: (a) The transfer or obligation was to an insider; (b) The debtor retained possession or control of the property transferred after the transfer; (c) The transfer or obligation was disclosed or concealed; (d) Before the transfer was made or obligation was incurred, the debtor had been sued or threatened with suit; (e) The transfer was of substantially all the debtor's assets; (f) The debtor absconded; (g) The debtor removed or concealed assets; (h) The value of the consideration received by the debtor was reasonably equivalent to the value of the asset transferred or the amount of the obligation incurred; (i) The debtor was insolvent or became insolvent shortly after the transfer was made or the obligation was incurred; (j) The transfer occurred shortly before or shortly after a substantial debt was incurred; and (k) The debtor transferred the essential assets of the business to a lien or who transferred the assets to an insider of the debtor.

Under Nevada law, "transfer" means "every mode, direct or indirect, absolute or conditional, voluntary or involuntary, of disposing of or parting with an asset or an interest in an asset, and includes payment of money, release, lease and creation of a lien or other encumbrance." NRS § 112.150.12.

NRS § 112.190 (Fraud in law) provides:

1. A transfer made or obligation incurred by a debtor is fraudulent as to a creditor whose claim arose before the transfer was made or the obligation was incurred if the debtor made the transfer or incurred the obligation without receiving a reasonably equivalent value in exchange for the transfer or obligation and the debtor was insolvent at that time or the debtor became insolvent as a result of the transfer or obligation.

2. A transfer made by a debtor is fraudulent as to a creditor whose claim arose before the transfer was made if the transfer was made to an insider for an antecedent debt, the debtor was insolvent at that time, and the insider had reasonable cause to believe that the debtor was insolvent.

NRS § 112.210 provides:

1. In an action for relief against a transfer or obligation under this chapter, a creditor, subject to the limitations in NRS 112.220, may obtain: (a) Avoidance of the transfer or obligation to the extent necessary to satisfy the creditor's claim; (b) An attachment or garnishment against the asset transferred or other property of the transferee pursuant to NRS 31.010 to 31.460, inclusive; and (c) Subject to applicable principles of equity and in accordance with applicable rules of civil procedure: (1) An injunction against further disposition by the debtor or a transferee, or both, of the asset transferred or of other property; (2) Appointment of a receiver to take charge of the asset transferred or of other property of the transferee; or (3) Any other relief the circumstances may require.

2. If a creditor has obtained a judgment on a claim against the debtor, the creditor, if the court so orders, may levy execution on the asset transferred or its proceeds.

NRS § 112.220, "Avoidance of transfer or obligation: Protection of good faith transferee or oblige; recovery of judgment for value of asset transferred; certain transfers not voidable," provides:

1. A transfer or obligation is not voidable under paragraph (a) of subsection 1 of NRS 112.180 against a person who took in good faith and for a reasonably equivalent value or against any subsequent transferee or obligee.

2. Except as otherwise provided in this section, to the extent a transfer is voidable in an action by a creditor under paragraph (a) of subsection 1 of NRS 112.210, the creditor may recover judgment for the value of the asset transferred, as adjusted under subsection 3 of this section, or the amount necessary to satisfy the creditor's claim, whichever is less. The judgment may be entered against: (a) The first transferee of the asset or the person for whose benefit the transfer was made; or (b) Any subsequent transferee other than a transferee who took in good faith for value or from any subsequent transferee.

3. If the judgment under subsection 2 is based upon the value of the asset transferred, the judgment must be for an amount equal to the value of the asset at the time of the transfer, subject to adjustment as the equities may require. . . .

6. A transfer is not voidable under subsection 2 of NRS 112.190 (**Fraud in law**): (a) To the extent the insider gave new value to or for the benefit of the debtor after the transfer was made unless the new value was secured by a valid lien; (b) If made in the ordinary course of business or financial affairs of the debtor and the insider; or (c) If made pursuant to a good faith effort to rehabilitate the debtor and the transfer secured present value given for that purpose as well as an antecedent debt of the debtor.

NRS § 112.230, the fraudulent transfer statute of limitations provision, provides:

1. A claim for relief with respect to a fraudulent transfer or obligation under this chapter is extinguished unless action is brought: (a) Under paragraph (a) of subsection 1 of NRS 112.180, within 4 years after the transfer was made or the obligation was incurred or, if later, within 1 year after the transfer or obligation was or could reasonably have been discovered by the claimant; (b) Under paragraph (b) of subsection 1 of NRS 112.180 or subsection 1 of NRS 112.190, within 4 years after the transfer was made or the obligation was incurred; or (c) Under subsection 2 of NRS 112.190, within 1 year after the transfer was made or the obligation was incurred.

2. This section does not apply to a claim for relief with respect to a transfer of property to a spendthrift trust subject to chapter 166 of NRS.

## 2. **Equitable Tolling**

"A federal court sitting in diversity applies the substantive law of the state, including the state's statute of limitations . . . Federal courts must abide by a state's tolling rules, which are integrally related to statutes of limitations." Albano v. Shea Homes Ltd. Partnership, 634 F.3d 524, 528 (2011). Nevada recognizes the equitable defense of tolling with regards to statutes of limitation. See, e.g., City of North Las Vegas v. State Local Government Bd., 127 Nev. 631, 639-40 (Nev. 2011).

The Nevada Supreme Court has adopted the Ninth Circuit's rule that "if a reasonable plaintiff would not have known of the existence of a possible claim within the limitations period, then equitable tolling will serve to extend the statute of limitations for filing suit until the plaintiff can gather what information he needs." Id. (quoting Lukovsky v. City and County of San Francisco, 535 F.3d 1044, 1051 (9th Cir. 2008). Under federal law, "Generally, a litigant seeking equitable

tolling bears the burden of establishing two elements: (1) that he has been pursuing his rights diligently, and (2) that some extraordinary circumstance stood in his way." Pace v. DiGuglielmo, 544 U.S. 408, 418 (2005).

### B. Discussion

#### A. Transfer of $946,335 from SCGC to SLG Holding Services AG on behalf of SLG on June 21, 2001

The Jecklin Defendants argue that this transfer was not made to any defendant, presumably because it was made to SLG Holding Services AG, rather than to SLG, AG. The Jecklin Defendants argue that Plaintiffs have presented no evidence of any intended beneficiary other than the relationship between the corporations. However, the Jecklin Defendants cite no binding authority to support the necessity of additional evidence, particularly as to a holding company of the same name, presumably also owned by JPC, a company closely held by Hans Jecklin and Christiane Jecklin.

The Jecklin Defendants state that SLG Holdings AG is a Swiss "daughter" company of SLG. Defendants argue that the payment at issue was for management fees and expenses performed by SCGC. The Jecklin Defendants reference "invoice details" explaining that the payment covered payments of $235,898 in flight expenses and $681,000 in consulting fees, as well as $28,826 in travel expenses for services by Richard, Haeberling, Moor, and Brugger & Partner, "and relate mostly to out of pocket expenses."

Plaintiffs raise transfers one through eight as "fraud in fact" transfers under NRS 112.180(a). Therefore, the Court considers the intent factors in 112.180(b). The Court finds that these facts raise a dispute as to fraud in fact under 112.180(1)(a). This was a substantial payment made to insiders—the "daughter" corporation of SLG, which is owned by JPC, which is closely held by the Jecklins—allegedly in order to make payments for consulting for Swiss contractors, including Defendant Haeberling. It was made less than a year after the NPA, and, as with all of the allegedly fraudulent transfers at issue, SCGC was insolvent or became insolvent shortly after

the transfer was made. Moreover, Plaintiffs have presented some evidence of inadequate documentation and incomplete invoicing.

A judgment in a fraudulent transfer claim may be directed against "the first transferee of the asset or the person for whose benefit the transfer was made." The Court finds that Plaintiff has raised a dispute as to whether the transfer was made to benefit SLG, the "parent" company, and JPC, the majority owner of SLG, closely held by the Jecklins, and thus as to the Jecklins themselves. However, even if Tipton coordinated or approved the transfer, there is no evidence that he directly or indirectly benefited from it; and Plaintiffs have alleged that his compensation consisted of separate allegedly fraudulent transfers. Therefore, this claim will be dismissed against Tipton.

The Jecklin Defendants argue that this claim is time barred. Plaintiffs assert this claim as a fraud-in-fact claim only; therefore, the statute of limitations is governed by NRS § 112.230(1)(a), which provides that the claim must be filed "within 4 years after the transfer was made or the obligation was incurred or, if later, within 1 year after the transfer or obligation was or could reasonably have been discovered by the claimant. The original complaint in this case was filed on November 29, 2005. The transfer took place on June 21, 2001. Thus, absent tolling or application of the discovery provision, the statue would have run in June 2005, roughly five months before the case was filed.

Plaintiffs argue that the statute of limitations should not bar their claims (1) because it should be tolled for the pendency of the New York litigation; and (2) because they did not discover the transfer until a time within the actionable period. Plaintiffs argue that the statute must be tolled because the parties were litigating the issue of whether SCGC owed anything; and until a judgment was issued, and until SCGC refused to pay or claimed it was unable to pay, there was no basis to assert a fraudulent transfer claim. If the judgment were paid, or if SCGC were found not to be liable, there would be no basis for a fraudulent transfer claim.

Defendants assert that the existence or not of a judgment should be irrelevant to tolling, and assert that the weight of the non-binding authority leads to that conclusion. Moreover,

Defendants argue, the statute is clear on its face that the savings clause applies only to discovery of the transfer rather than whether and to what extent the transfer may have been fraudulent.

The Court need not decide whether the New York litigation alone should toll the statute. Nevada law is clear that "if a reasonable plaintiff would not have known of the existence of a possible claim within the limitations period, then equitable tolling will serve to extend the statute of limitations for filing suit until the plaintiff can gather what information he needs." City of North Las Vegas v. State Local Government Bd., 127 Nev. at 639-40. Nothing in the text of the statute suggests an intent to negate this basic principle of equity. The Jecklin defendants make no effort to contest Plaintiffs assertion as to the timing of the discovery of the fraudulent nature of the transfers. Therefore, the Court will not dismiss the claim on the basis of the statute of limitations.

Defendants' argument regarding statutory interpretation is unpersuasive. A savings clause such as that at issue here is clearly designed to serve the equitable principle that a Plaintiff should not be denied a cause of action where he does not discover facts giving rise to that cause action until after the generally applicable actionable period—if a Plaintiff had not discovered facts giving rise to a claim, but only that a not unlawful event consistent with, or necessary but not sufficient for liability had happened, then she would have no reason to bring a claim. The Court will not read the ambiguous savings clause to negate the generally applicable principle of equitable tolling, but will instead read it to be consistent with the principle, as adopted by the Nevada Supreme Court, that "if a reasonable plaintiff would not have known of the existence of a possible claim within the limitations period, then equitable tolling will serve to extend the statute of limitations for filing suit until the plaintiff can gather what information he needs." Id. The Jecklin defendants make no effort to contest Plaintiffs assertion as to the timing of the discovery of the *fraudulent nature* of the transfers. Plaintiffs assert that they did not discover the fraudulent nature of the transfer until late in Rule 69 discovery in the New York Litigation in mid-2005. The Court finds that the Plaintiffs did not discover the fraudulent nature of the transfers until after the transfer such that the claim in this case is not time-barred. Therefore, the Court will not dismiss the claim on the basis of the statute of limitations.

**B. Transfer of $1,325,000 from SCGC to SLG Holdings Services AG on behalf of SLG on July 16, 2002**

Considering the intent factors under N.R.S. § 112.180(b), the Court finds that Plaintiffs have raised a dispute as to this transfer. The dispute involves a settlement payment to SCRE, a wholly owned subsidiary of debtor SCGC. Here again the payment was to SLG Holding Services AG. While this payment occurred somewhat later, it occurred within a week of the receipt of the funds from the litigation settlement. The immediacy of this insider transfer, order by Hans Jecklin, and carried out by Tipton, is sufficient to raise a dispute. Here again, the claim is dismissed as against Haeberling, since Plaintiffs have not presented facts raising a dispute as to any benefit to Tipton.

**C. Transfer of $1,300,000 from SCGC to JPC on February 20, 2002**

In light of the close ties among the Jecklins, who closely held JPC, which majority owned SLG, the Court finds that Plaintiffs have raised a dispute as to liability for all Defendants except Tipton. Here again, the transfer was made to an insider roughly a week after receipt of the funds from a litigation settlement. Moreover, the nature of the board minutes, including the later approbation but non-presence of board member Tipton, and the nature of the justification, as laid out above, are sufficient to raise a dispute as to intent to hinder, delay, or defraud.

**D. Transfer of $425,000 from SCGC to JPC on March 11, 2002**

Here again, a payment was made very shortly after receipt of funds, to an insider. The payment was purportedly for interest owed to SLG yet the payment was made to the parent company closely held by the Jecklins. Plaintiffs have raised a dispute as to liability of the Jecklin Defendants. Here again, there is no evidence to support liability for Tipton.

**E. Transfer of $1,200,000 from SCGC to JPC on May 21, 2002**

This payment was made just three days after receipt of funds. For the same reasons as transfer four, this claim may proceed against the Jecklin Defendants but not Tipton.

**F.   Transfer of $10,000,000 from SCRE on behalf of SCGC to Hans Jecklin, JPC, or SLG, on February 8, 2001**

Plaintiffs have raised a dispute as to this transfer. Among other evidence, they have produced contradictory board minutes purporting to justify payment to Hans Jecklin or JPC directly, or to SLG to pay certain alleged debts. The payment was made roughly six months after the NPA, and would constitute a large portion of the debt owed under that agreement, and a large portion of SCGC's assets. This claim may proceed against the Jecklin Defendants.

Regarding the statute of limitations, Defendants again do not challenge the facts regarding when Plaintiffs discovered the *fraudulent nature* of the transfer, but rather assert that that is irrelevant. Once again, Plaintiffs assert that they did not discover the fraudulent nature of the transfer until late in Rule 69 discovery in the New York Litigation in mid-2005. For the same reasons stated above as to the first transfer, the Court will not dismiss this transfer on the basis of any statute of limitations.

**G.   Transfers of $117,757.70 from SCRE on behalf of SCGC to Tipton on March 8, 2002 and of $71,292.73 from SCRE on behalf of SCGC to Tipton on July 16, 2002**

Plaintiffs argue that these transfers are both fraud in fact transfers under NRS § 121.180(1), and fraud in law transfers under NRS § 112.190. The Jecklin Defendants argue that they must be dismissed from these transfers because there is no evidence that they are the beneficial transferees or that they received or benefited in any way from the transfers. The Court agrees. There is no substantial evidence that the transfers were made for the benefit of the Jecklin Defendants, who benefited in far greater amounts from the prior-discussed transfers.

Plaintiffs have, however, raised a dispute as to transfers 7 and 8 as fraud in fact transfers to Tipton. Plaintiffs have presented some evidence that Tipton, an insider and officer of SCGC, received substantial bonuses, in addition to his salary, well after the insolvency of the Resort and likely default on the NPA had become clear. Moreover, the bonuses do not appear to have been endorsed by the SCGC board as required under the bylaws.

Plaintiffs have also raised a dispute as to 7 and 8 as fraud in law transfers to Tipton. Defendants argue that Tipton already received a substantial salary and yearly bonus for his services to SCGC and its subsidiaries, and that his services, to the extent that they benefited the company, were less needed in 2002 because the companies had almost entirely ceased operation. SCGC was insolvent or imminently insolvent at the time of these transfers.

Having reviewed the evidence in support and opposition, including the Trugman Associates' report, the Court finds that Plaintiffs have raised a dispute as to each transfer, but have not proven any beyond a reasonable dispute.

## VI.    DISCUSSION – ALTER EGO LIABILITY

### A.  Legal Standard

#### 1.  Choice of Law

"A federal court sitting in diversity ordinarily must follow the choice-of-law rules of the State in which it sits." Atlantic Marine Const. Co., Inc. v. U.S. Dist. Court, 134 S. Ct. 568, 582 (2013). Neither party has cited to and there does not appear to be a Nevada Supreme Court case deciding choice of law as to veil piercing claims.[1]

To determine which state's law to apply to contract claims, Nevada uses the "substantial relationship" test. Consol. Generator-Nev., Inc. v. Cummins Engine Co., Inc., 971 P.3d 1251, 1253 (Nev. 1998). To determine whether a state possesses a substantial relationship with a contract, courts consider five factors: "[1] the place of contracting, [2] the place of negotiation of the contract, [3] the place of performance, [4] the location of the subject matter of the contract, and [5] the domicile, residence, nationality, place of incorporation and place of business of the parties." Id. at 1253-54. Additionally, applying another state's law must not violate a strong public policy of Nevada. Id. at 1254. Courts apply these factors to decide which state bears the most significant relationship to the contract. Id.

---

[1] The Court recognizes that the Nevada legislature has provided that "the laws of the state or jurisdiction under which a foreign limited partnership is organized govern its organization and internal affairs and the liability of its limited partners." NRS § 88.570. The Court does not find it appropriate to make any inference as to intent regarding corporations from the existence of this provision and the non-existence of any analogous provision governing corporations.

The Jecklin and corporate defendants assert that Nevada follows the Restatement of Conflict of laws in determining the applicable law for alter-ego claims. Defendants cite to an unpublished Nevada federal district court opinion, which merely states that the Court has reviewed the applicable rules and cites to the restatement: "<u>See</u>, Restatement (Second) of Conflict of Law § 307 (1971) (providing that the local law of the state of incorporation will be applied to determine the existence and extent of a shareholder's liability to a corporation's creditors for corporate debts)." <u>U.S. v. Ergs, Inc.</u>, 2007 WL 174675, *2 (D. Nev. 2007). The Nevada Supreme Court, has exercised its discretion to adopt portions of the Second Restatement of Conflict of Laws. <u>See, e.g.</u> <u>Pacific W. Bank v. Eighth Judicial Dist. Ct. of State in and for County of Clark</u>, 383 P.3d 252, 254-55 (Nev. 2016).

While the Nevada Supreme Court has found the Restatement to be generally applicable to certain types of actions, it has not created a rule as to application of the Restatement to all undecided choice of law questions or any that would necessarily govern here. <u>See, e.g.</u> <u>General Motors Corp. v. Eighth Judicial Dist. Ct. of State of Nev. ex rel. County of Clark</u>, 134 P.3d 111, 468 (finding that the "most significant relationship test" of the Restatement should apply in all tort actions unless a more specific restatement section applies). The Nevada Supreme Court has however, stated that "Nevada tends to follow the Restatement (Second) of Conflict of Laws (1971) in determining choice-of-law questions involving contracts, generally[.]" <u>Progressive Gulf Ins. Co. v. Faehnrich</u>, 327 P.3d 1061, 1064 (Nev. 2014).

Section 307 "Shareholders' Liability," of the Second Restatement of Conflict of Law, provides: "The local law of the state of incorporation will be applied to determine the existence and extent of the shareholder's liability to the corporation for assessments or contributions and to its creditors for corporate debts." The Reporter's Note to the section, however, contains a section, "Liabilities imposed upon shareholders of a foreign corporation" which provides: "A state may impose liability upon a shareholder of a foreign corporation for an act done by the corporation in the state, if the state's relationship to the shareholder is sufficient to make reasonable the imposition of such liability upon him." Restatement (Second) of Conflict of Law § 307, Reporter's Note (1971) (citing <u>Thomas v. Matthiessen</u>, 232 U.S. 221 (1914) and <u>Pinney v. Nelson</u>, 183 U.S. 144

1    (1901)).  Thus, while the Restatement provides a general rule of application it reserves to a state

2    the prerogative of asserting its own laws where it would be appropriate to vindicate the state's

3    interests in particular circumstances.

4        The Court finds that in this case the substantial relationship test should apply to the alter-

5    ego claims to determine the applicable law.    First, the Court finds that read in light of the

6    Reporter's Note, the Restatement provides alternative frameworks as to the choice of law in a

7    situation, as here, where the "naked fact" of incorporation in a particular state is the only fact

8    supporting application of that state's law and where there are countervailing reasons for applying

9    the forum state's law. Second, the Court finds that there is a strong public policy rationale for

10   application of Nevada law to veil piercing claims such as those at issue here.  These claims often

11   involve issues of fraud or misrepresentation as to contractual obligations or other obligations

12   arising in the state or related to transactions or assets in the state.  Nevada has a strong interest in

13   monitoring such conduct and the substantial relationship test offers a test recognized by the Nevada

14   Supreme Court as a means for addressing the state's interest in related contexts.  Moreover, this

15   case arises from a real estate development transaction, and Nevada has a strong public policy

16   interest in uniform and discernible rules regarding liability for the payment of real estate debts.

17   That the project giving rise to the debt and the contract was exclusively a Nevada real estate project

18   to operate, generate revenue, and incur liability in Nevada, lends support to the application of

19   Nevada law, or the law applicable under the substantial relationship test.  Finally, as the liability

20   in this case would not likely exist without the contract, the substantial relationship test applicable

21   to contract claims represents the most reasonable and appropriate test for the choice of law as to

22   the alter-ego claims.

23       The Court finds that Nevada has the most substantial relationship to the alter-ego claims

24   here.  The Court does not find persuasive Defendants' argument that New York would have a

25   superior interest or relationship with the contract or liability at issue here. Defendants cite to facts

26   as to Plaintiffs place of business in New York City, and as to the negotiation for the relevant

27   contract – the NPA – occurring in New York City. However, Defendants are incorrect that this is

28   a financial transaction contract that had nothing to do with Nevada real estate. This was a contract

for a company that at that point had a single purpose related to Nevada real property, to buy back debt related to a Nevada development project. Defendants have not cited to any contract provision that purports to require the application of New York law, and the Court does not find that negotiation taking place in New York is more substantial than the fact that the buyer, and the company at issue for the veil-piercing claims operated solely in Nevada, and incurred the relevant debt in Nevada. Therefore, the Court will apply Nevada law to the veil piercing claims.

## 2. **Piercing The Corporate Veil**

"Nevada has long recognized that although corporations are generally to be treated as separate legal entities, the equitable remedy of "piercing the corporate veil" may be available to a plaintiff in circumstances where it appears that the corporation is acting as the alter ego of a controlling individual." <u>LFC Marketing Group, Inc. v. Loomis</u>, 8 P.3d 841, 845 (Nev. 2000). "Indeed, the "essence" of the alter ego doctrine is to "do justice" whenever it appears that the protections provided by the corporate form are being abused." <u>Id.</u> at 845-46.

"The elements for finding an alter ego, which must be established by a preponderance of the evidence are: (1) the corporation must be influenced and governed by the person asserted to be the alter ego; (2) there must be such unity of interest and ownership that one is inseparable from the other; and (3) the facts must be such that adherence to the corporate fiction of a separate entity would, under the circumstances, sanction [a] fraud or promote injustice." <u>Id.</u> at 846.

"Further, the following factors, though not conclusive, may indicate the existence of an alter ego relationship: (1) commingling of funds; (2) undercapitalization; (3) unauthorized diversion of funds; (4) treatment of corporate assets as the individual's own; and (5) failure to observe corporate formalities." <u>Id.</u> "We have emphasized, however, that "[t]here is no litmus test for determining when the corporate fiction should be disregarded; the result depends on the circumstances of each case." <u>Id.</u>

## B. **Time of Pertinent Facts**

Considered in their totality, the undisputed and disputed facts raise a dispute as to whether the Defendants were alter-egos of SCGC at the time of the fraudulent transfers and the Jecklins'

withdrawal to Switzerland. The Swiss Defendants have argued that even if alter-ego liability could be established on the basis of post-NPA activity, the relevant inquiry is only whether the Defendants were the alter-ego of SCGC at the time of the NPA. Defendants, focusing on the known change in the contract from the corporate defendants SLG and JPC, to SCGC only, argue that where the contract was not entered into with fraudulent intent on the part of the Defendants as the alter egos of SCGC, then the liability would be fixed forever at the assets of SCGC. While Mr. Jecklin and the other defendants could be liable for subsequent fraudulent transfers, they could not alter that fixed liability, even if they effectively seized control of the corporation as alter-egos subsequent to the agreement.

Therefore, the Court must answer a question not yet answered by the Nevada Supreme Court—whether an individual may be liable for the entirety of a corporate debt, where the individual becomes the alter-ego of the entity subsequent to the debt-incurring transaction or contract. This is distinct from the related inquiry – whether the totality of the evidence of alter-ego relationship, including that pertaining to actions taken after the contract, may raise a dispute as to alter-ego relationship at the time of the contract.

The Court begins from the premise that the foundational principle of alter ego liability under Nevada law is equity. "Indeed, the "essence of the alter ego doctrine is to do justice whenever it appears the protections provided by the corporate form are being abused." LFC Marketing Group, Inc. v. Loomis, 8 P.3d at 845-46. Moreover, while each of the three basic elements must be established, "there is no litmus test for determining when the corporate fiction must be disregarded; the result depends on the circumstances of each case." Id. at 846.

The Court finds that equity considerations in the context of potentially fraudulent transfers of assets support subjecting a person or entity who subsequently becomes the alter ego of a corporation to the entirety of a pre-existing corporate debt incurred at time when it cannot be proven that the alter ego relationship had existed.  That is because an entity or individual who subsequently becomes the alter ego of an indebted entity may still fraudulently or improperly transfer assets from the indebted entity where such assets should rightfully—for the purpose of maintaining the solvency and viability of the indebted entity—be allocated to some or all of the

debts the entity accrued prior to the unification or commingling of funds and interests. It is equitable that where one "seizes" an indebted corporate entity for personal enrichment, one exposes oneself to the debt of the entity, at least where one had a substantial relationship to the entity, and full knowledge of the potential exposure, prior to and during the debt-incurring agreement.

Moreover, it is appropriate to consider the defendants ties to the company prior to and during the debt-incurring transaction, and their knowledge of the extent of the debt incurred in that transaction at the time of the transaction and at the time they "seize" the company and become its alter-ego. Here Defendants would allegedly have been fully aware of the financial status of the various entities, including SCGC, and of any subsequent intentions on the part of themselves and the entities they controlled. Therefore, the Court finds that the equities support the potential for alter-ego liability by which the Defendants would be liable for the entirety of the NPA debt. And, the Court finds that the evidence viewed in its totality raises a dispute as to whether the Defendants were the alter ego of SCGC at the time of the NPA, and intended to use the agreement to facilitate the siphoning off of assets. The record also raises a dispute as to whether the Defendants, having been made aware of the debit incurred under the NPA, nonetheless, improperly commingled and/or transferred assets that should have been allocated to the debts of SCGC.

Under Nevada law, to establish alter-ego liability "the facts must be such that adherence to the corporate fiction of a separate entity would, under the circumstances, sanction fraud *or promote injustice*." LFC Marketing Group, Inc., 8 P.3d at 846. Plaintiffs have raised a dispute as to whether the contract was entered into by SCGC at the behest of, and in essence, *as* Hans Jecklin, or another Defendant, for the purpose of the subsequent stripping of the corporation for their personal benefit. As laid out by the Nevada Supreme Court, the inquiry is focused on the relationship between the corporate entity and the defendant, not the extent of the Plaintiff's knowledge or the reasonableness of their acquiescence to a particular agreement. The Court reiterates that the inquiry is essentially equitable. The mere existence of a contract does not remove the possibility of a finding of alter ego liability.

### C. Fraudulent Transfers as Evidence of Alter Ego

The Court incorporates by reference its findings as to the fraudulent transfer claims. The Nevada Supreme Court has found that "unauthorized diversion of funds" is among the factors that may be considered in the equitable alter ego inquiry. See LFC Marketing Group, 8 P.3d at 846. In a "stripping" case, such as this, such claims are essential to the fraud or injustice inquiry.

### D. Hans Jecklin

Plaintiffs have raised a dispute as to whether SCGC was influenced and governed, and had a unity of interest and ownership with Hans Jecklin at the time of and after the signing of the NPA. As stated above, Hans Jecklin partially owned and sat on the boards of SCGC, SLG, and JPC, among other relevant entities. According to August 30, 1999 joint minutes of a meeting of the board of directors of SCGC and the RAS, Inc., "Mr. Jecklin will be taking the lead in all the decision making to turnaround the project." Thus, Mr. Jecklin could be found to have influenced and controlled SCGC a year before Tipton signed the NPA. Plaintiffs have presented further evidence in the form of communications from Wolfgang Gross, the SLG and JPC chief financial officer who took on a senior management role for SCGC prior to the NPA, advising Hans Jecklin to exit from the United States and cease retiring RAS debt.

Plaintiffs have raised a dispute as to whether adherence to the corporate fiction would sanction a fraud. The evidence shows use of corporate funds to pay for the personal property of the Jecklins, and an intent, if not the realization, to charge an SCGC entity monthly rent for Mr. Jecklin's personal residence, although the entity had already been making mortgage payments. Through SLG, JPC, or directly, Hans Jecklin could be found to have benefited from nearly all of the allegedly fraudulent transfers. The largest $10 million transfer is described in one of the two contradictory minutes as going to "Hans Jecklin personally or to [JPC]." These minutes, signed by the Jecklins but not by Tipton, describe Tipton as "the director absent." Tipton reviewed them and expressed his approval but never signed. These facts, among others laid out above, raise a dispute as to whether Hans Jecklin, alone or with the other Defendants, effectively controlled SCGC and the other casino entities, and at or after the signing of the NPA, intended to strip the indebted

entities for his personal benefit. As such, they raise a dispute as to whether adherence to the corporate fiction would sanction a fraud or promote injustice, and whether Hans Jecklin may be held liable for the NPA debt.

Having reviewed the evidence in support and opposition, the Court finds that Plaintiffs have raised a dispute as to alter ego liability for Hans Jecklin. Therefore, the claim will proceed to trial.

### E. Christiane Jecklin

In addition to being married to Hans Jecklin, Christiane Jecklin is a 25% owner, with Hans Jecklin owning the remaining 75%, of Defendant JPC, which is the majority owner of Defendant SLG, which is the majority owner of SCGC. Christiane, with Hans, was a board member of SCGC. The combination of her familial and business ties with Hans Jecklin, including her approval of the $10 million "loan" to her husband, as well as the evidence of her personal enrichment through casino entity payments for both homes, maid staff, and benefits to her children, are sufficient to raise a dispute as alter ego alongside Hans. While documents less often refer specifically to Christiane, nearly every official document or board minutes signed by Hans Jecklin is also signed by Christiane as another director. The August 30, 1999 minutes that state that Hans Jecklin will take the lead in the turnaround, further state that decisions from Christiane should be taken as decisions from Hans. The Court finds that Plaintiffs have raised a dispute as to alter ego liability for Christiane Jecklin. Therefore, the claim will proceed to trial.

### F. George Haeberling

The Court finds that Plaintiffs have raised a dispute as to alter ego liability for Defendant George Haeberling.

As with the Jecklin's, Haeberling was a board member of SCGC during the time of the financial collapse, of the NPA, and at the time of at least three of the subsequent alleged fraudulent transfers, including the $10 million loan with the contradictory board minutes. Here again the totality of the evidence is sufficient to raise a dispute as to (1) whether Haeberling was an alter ego

of SCGC at the time of the negotiation and agreement to the NPA and in the subsequent period of the alleged stripping, and (2) whether Haeberling became the alter ego of SCGC/SCA through his role in the subsequent stripping.

In addition to his position on the board of SCGC, Haeberling's position on the corporate boards and his ownership of stock in the relevant corporations, suggests a close relationship with the Jecklins. Hans Jecklin, Christiane Jecklin, and George Haeberling were the sole directors and shareholders of Swiss Leisure Group AG, which owned 94% of the capital stock of SCGC. Haeberling, with another company, owned the remaining 6% of the voting shares. During the relevant period, SLG was majority-owned by another Swiss company based in Zurich, Defendant JPC. Defendants Hans Jecklin, Christiane Jecklin and Haeberling were members of SLG's board of directors. Haeberling resigned from SLG's board in March of 2002. Also during the relevant period, Hans and Christiane Jecklin owned 75% and 25% of JPC, respectively. Hans Jecklin, Christiane Jecklin and Haeberling were also on JPC's board of directors. Haeberling resigned from JPC as well in March 2002. Notably, JPC, at the top of the corporate pyramid, was owned entirely by Hans and Christiane Jecklin. Haeberling was the only other director of JPC, and the only non-owner, non-family board member.

In a confidential memo dated October 12-18, 2000, Haeberling included a section entitled "Boards (especially SOA, RAS, Inc.)." Under "measures" he notes that he (Haeberling) would take over the Swiss representation on site latest until the Ch. 11 procedure is completed. The memo further reads as follows: "Framework conditions: . . . [George Haeberling] is on site 2 weeks per month; no important decisions without previous consultation with [Hans Jecklin] and "Hans Rihs"; [John Tipton] reports to [George Haeberling.]

December 12, 2000 minutes for Swiss Casino Holdings, AG (another name for Defendant SLG), for a meeting at which, according to the minutes, Haeberling and the Jecklins were present, occurring two weeks after Haeberling "resigned from all of the other U.S. entities on whose boards he had been serving," in order "to avoid potential conflicts of interest," state that "Hans Jecklin proposed that a USA task force ("de facto board" be designated with Dr. Schweizer, Dr. Haberling [sic], Martin Egli (Swiss Partner), Christa Jecklin and himself, because he sees an urgent need for

action for further decisions." In the same minutes dated December 12, 2000 for Swiss Casino Holdings AG" (Defendant SLG), which state that Haeberling was present as a "delegate," Haeberling was tasked by the board with "investigating whether, and the extent to which, the funds arising from the land sale in the U.S. can be transferred to Switzerland."

Thus after his resignation in order to "avoid potential conflicts of interest," Haeberling was designated as, or at least was present and did not oppose a proposal that he be designated as a "de facto board" member of the US operation, and was specifically tasked with determining what if any funds from land sale could be transferred to Switzlerland. Contradictory minutes dated two months later purport to justify the transfer of 10 million dollars to Hans or JPC. Six months after that, Haeberling drafted the memo expressing concern as to SLG's potential alter ego liability, raising particular concern as to John Tipton, who according to the memo he (Haeberling) produced in October, would report to him as of October 12-18, 2000 (less than one month after the NPA).

Haeberling's position as a Swiss attorney closely tied to the Jecklins, including through formal positions and ownership stakes in the various entities, as well as his role, in conjunction with the Jecklins, in high-level business and legal decisions—as evidenced by, for example, the October 2000 and August 2001 memos, raise a dispute as to the first two prongs.

Plaintiffs have also raised a dispute as to whether alter ego liability is necessary so as not to sanction fraud or injustice. The August 2001, post-NPA, post ten-million-dollar "loan," memo, drafted by Haeberling, advised the Jecklins to transfer their home, which had been purchased with SCGC funds, to their sons. Moreover, Haeberling appears to have been tasked with figuring out what funds from land proceeds could be transferred to Switzerland, and produced a legal memo as to alter ego liability in August 2001, well after the date of the minutes purporting to justify the $10 million transfer. He remained on the boards of SLG and JPC, closely held by the Jecklins, and in the case of JPC, as the only non-owner, non-family member, until March 2002, at or before the time of the allegedly fraudulent $1.3 million transfer of funds from a litigation settlement, and $425,000 transfer from return of an insurance premium to SCGC.

Finally, the Court notes that it is immaterial whether Plaintiffs can prove that Haeberling directly benefited from his role; the standard for alter ego liability does not ask whether adhering

to the corporate fiction would sanction a fraud *to the personal benefit of the* alter ego; rather it asks whether it would "sanction fraud or promote injustice." To require proof of personal benefit would undermine the purpose of alter ego liability and permit evasion of responsibility and inequity where a co-conspirator acts to enrich others, who, in turn, may enrich him. Thus where, as here, the elements have been met, including the sanctioning of a fraud to the detriment of the Plaintiffs, a Defendant may be personally liable as an alter ego. However, even if some evidence of potential personal enrichment were necessary, the Court finds that the close business ties between the Jecklins and Haeberling would sufficiently establish potential personal benefit.

### G. John Tipton

Plaintiffs have raised a dispute as to influence and unity of interest and ownership. SCGC was majority-owned by Defendant SLG, a Swiss company based in Zurich, and its minority shareholders included Defendants Haeberling and Defendant Tipton. SCGC's board members included Hans Jecklin, Christiana Jecklin, Haeberling and Tipton. For portions of the relevant period, Tipton was SCGC's CEO, president, CFO, secretary, treasurer and general counsel. By 2000, the nominal officers of SCGC and its subsidiaries had been stripped of the authority to approve any and all payments; "[a]ny expense [of SCGC or any of its subsidiaries], small or large" was to be approved by Tipton, and one of Hans Jecklin, Gross or Brugger. The NPA was personally negotiated and signed by Tipton on August 3, 2000. As laid out above, Tipton personally negotiated and signed the NPA, and remained a director, and one of the few officers of SCGC for the duration of the relevant period.

Plaintiffs have raised a dispute as to whether adherence to the corporate fiction would sanction a fraud. John Tipton arranged for a nearly three-million-dollar payment from SCGC to PDS, in July 2000, one month before signing the NPA. PDS hired Tipton as its general counsel in 2004. He played a critical role in the allegedly fraudulent $10 million transfer—including in reviewing and accepting the contradictory minutes for meetings in Switzerland purporting to justify the transfer, and listing Tipton as "the director absent"—and received substantial bonuses in 2002 in spite of SCGC's financial condition, and the limited operations of the companies he

managed at that time. As a minority shareholder of SLG, who served as an officer of SCGC throughout the relevant period, Tipton would have been fully aware of the financial condition of the resort project and of the intentions of SCGC and the Defendants at the time he negotiated and signed the NPA. The Court finds that Plaintiffs have raised a dispute as to alter ego liability for John Tipton. Therefore, the claim will proceed to trial.

### H. SLG

Not only is there substantial overlap in directors and officers of SCGC and SLG, namely the Jecklins, George Haeberling, and Wolfgang Gross, but the involvement of the SLG-affiliated Swiss actors greatly increased—indeed they became the "de facto board" of SCGC in spite of Haeberling's resignation, when the resort project began to decline, and maintained their supremacy in decision making throughout the relevant period. Even absent more, the near total control by the directors and officers of SLG, sometimes in contravention of bylaws or official positions, might be enough to raise a dispute as to alter-ego liability for the parent corporation. As stated by Haeberling in his August 21, 2001, memo, "the door will be opened for the plaintiffs' piercing of the corporate veil to reach SLG (formerly SCH) . . . The fact that, with increasing difficulty on the part of the resort, an increasing number of Swiss "top shots" were flown in, some of whom engaged in more than mere analysis or consulting will be played up and exploited."

However, the Court need not rely exclusively on the overlap of interests and personnel. SLG is directly implicated in nearly every action presented as evidence of "stripping" including the $10 million loan payment with contradictory minutes directing payment to Hans or JPC, and SLG, respectively. Indeed, it is SLG that appears to have benefited most directly from the funds allegedly owed to Plaintiffs. SLG or its "daughter company," SLG Holdings AG, received three of the transfers, including, potentially, the largest $10 million transfer. Three were received by JPC, which majority owned SLG, and shared as directors Defendants Hans Jecklin, Christiane Jecklin, and George Haeberling. Only the smallest of the alleged fraudulent transfers, the bonuses to John Tipton, do not directly implicate SLG or JPC. Plaintiffs have raised a dispute as to alter ego liability of SLG.

### I. JPC

For substantially the same reasons as SLG, Plaintiffs have raised a dispute as to the alter ego liability of Defendant JPC. As with SLG, the dispute arises not merely from the overlap of interests and personnel, but from the direct enrichment or benefit of JPC as a result of the transfers. Every one of the directors of JPC—Haeberling and the Jecklins—was intimately involved in the management and operation of SCGC. Regarding the transfers, JPC not only benefited from the transfers to SLG, which it majority owned, but from those it received directly, including transfers three, four, and five, and potentially transfer six, the $10 million "loan" payment.

### VII. AGENCY LIABILITY

#### A. Legal Standard and Choice of Law

##### 1. The Agency Theory

Plaintiffs cite to <u>Bowoto v. Chevron Texaco Corp.</u>, 312 F.Supp.2d 1229, 1238 (N.D. Cal. 2004), which provides a general outline of agency liability as a means of holding a parent corporation liable for the acts of a subsidiary. <u>Bowoto</u> cites the Restatement (Second) of Agency § 14, which provides:

> "[A] corporation may become an agent of an individual or of another corporation, as it does when it makes a contract on the other's account. Thus a subsidiary may become an agent for the corporation which controls it, or the corporation may become the agent of the subsidiary. In some situations, a court may find that the subsidiary has no real existence or assets, that its formal existence is to cloak a fraud or other illegal conduct. As in a similar situation in which an individual is the offender, it may be found that the parent company is the real party to a transaction conducted by the illusory subsidiary and responsible for its transactions as a principal." <u>Id.</u> (citing Restatement (Second) of Agency § 14).

<u>Bowoto</u> further provides, "unlike liability under the alter-ego or veil-piercing test, agency liability does not require the court to disregard the corporate form." <u>Id.</u> <u>Bowoto</u> quotes the Ninth Circuit for the principle that agency liability is not a new theory, but rather the application of traditional agency principles in the corporate context: "We believe the liability in most of such cases is based correctly on the rules of agency.... As such it is not a new rule of law, but an old one

applied to new situations. Where one corporation is controlled by another, the former acts not for itself but as directed by the latter, the same as an agent, and the principal is liable for acts of its agent within the scope of the agent's authority." <u>Pacific Can Co. v. Hewes</u>, 95 F.2d 42, 45–46 (9th Cir.1938) (citations omitted).

As laid out in <u>Bowoto</u>, the appropriate inquiry is not whether an agency relationship exists generally, but rather whether the *liability-incurring action* was conducted in the subsidiary's role as an agent. <u>See</u> <u>Bowoto</u>, 312 F. Supp. 2d at 1240 (citing <u>Scott v. Ross</u>, 140 F.3d 1275, 1280 (9th Cir. 1998)).

### 2. **Choice of Law**

"A federal court sitting in diversity ordinarily must follow the choice-of-law rules of the State in which it sits." <u>Atlantic Marine Const. Co., Inc. v. U.S. Dist. Court</u>, 134 S. Ct. 568, 582 (2013). Neither party has cited to and there does not appear to be a Nevada Supreme Court case deciding choice of law as to agency liability of a parent corporation for a subsidiary's debts. As noted above, the Nevada Supreme Court, has exercised its discretion to adopt portions of the Second Restatement of Conflict of Laws. In the absence of contrary authority, the Restatement is persuasive as to how the Nevada Supreme Court would rule as to choice of law in this context. The Restatement (Second) of Conflict of Law § 292 provides:

> (1) Whether a principal is bound by action taken on his behalf by an agent in dealing with a third person is determined by the local law of the state which, with respect to the particular issue, has the most significant relationship to the parties and the transaction under the principles stated in § 6.
> (2) The principal will be held bound by the agent's action if he would so be bound under the local law of the state where the agent dealt with the third person, provided at least that the principal had authorized the agent to act on his behalf in that state or had led the third person reasonably to believe that the agent had such authority.

Section 6 of the Restatement provides:

> (1) A court, subject to constitutional restrictions, will follow a statutory directive of its own state on choice of law.
> (2) When there is no such directive, the factors relevant to the choice of the applicable rule of law include
>     (a) the needs of the interstate and international systems,
>     (b) the relevant policies of the forum,
>     (c) the relevant policies of other interested states and the relative interests of those

states in the determination of the particular issue,
(d) the protection of justified expectations,
(e) the basic policies underlying the particular field of law,
(f) certainty, predictability and uniformity of result, and
(g) ease in the determination and application of the law to be applied.

For the same reasons discussed as to alter ego liability, including the predominance of Nevada contacts as to the underlying business conduct, and Nevada's interest in control over and uniform expectations as to liabilities in real estate and gaming transactions, the Court finds that Nevada has the most significant relationship to the parties and to the transaction under the principles laid out in § 6 and that the Nevada Supreme Court would find that Nevada law applies here to determine whether SCGC acted as an agent of SLG and JPC and can therefore be liable if the parent corporations can be liable.

Nevada courts have yet to adjudicate the issue of the liability of a parent corporation for a subsidiary's debt under an agency theory. The Nevada Supreme Court has laid out the following standard for agency liability:

> "Generally, the existence of an agency is a question of fact. Accordingly, this court will uphold the district court's agency determination as long as it is not clearly erroneous and supported by substantial evidence." Simmons Self-Storage v. Rib Roof, Inc., 331 P.3d 850 (Nev. 2014). "To bind a principal, an agent must have actual authority . . . or apparent authority. Although we have discussed actual authority in the past, we have never expressly defined it. We now adopt the Restatement's definition. 'An agent acts with actual authority when, at the time of taking action that has legal consequences for the principal, the agent reasonably believes, in accordance with the principal's manifestations to the agent, that the principal wishes the agent so to act,' Restatement (Third) of Agency § 2.01 (2006). When examining whether actual authority exists, we focus on an agent's reasonable belief." Id.

The Court finds that agency liability, as a distinct theory from alter-ego or piercing liability, should follow the traditional law of agency. Moreover, following Bowoto, the Court finds that the Nevada Supreme Court would adopt the following principle that flows from the rationale behind agency liability: "In addition to the need for a close relationship or domination between the parent and subsidiary, agency liability also requires a finding that the injury allegedly inflicted by the subsidiary, for which the parent is being held liable, was within the scope of the subsidiary's authority as an agent." 312 F. Supp. 2d at1229 (citing Phoenix Canada Oil v. Texaco, 842 F.2d 1446, 1477-78 (3d Cir. 1988)).

Plaintiff argues that to allow agency liability would merely circumvent the legal requirements of alter ego. This misunderstands the application of two distinct doctrines. Alter ego does not establish a standard of third-party liability more rigorous than agency, thereby superseding agency liability—rather alter ego serves a different purpose; it allows a person or entity to be subject to the liabilities of a corporation even absent proof of agency, or actual authority to commit a discrete instance of liability-incurring conduct.

A Plaintiff should not be required to show an alter ego relationship over any extended period of time, in order to seek recovery for a discrete action taken with actual authority of the principal. That is because with regard to agency, the relevant inquiry covers only the discrete, liability-incurring conduct itself, the conduct carried out with actual authority of the principal.

### B. Discussion

The Court finds that Plaintiff has raised a dispute as to "agency liability" as to whether SCGC and Tipton acted as the agent of the undisclosed principals—SLG or JPC—in securing the Note Purchase Agreement. The Court finds that the undisputed and disputed evidence laid out as to alter ego liability above serve as evidence of a potential agency relationship at the time of the negotiation and finalization of the Note Purchase Agreement.

The Court highlights the following facts that contribute to a genuine dispute as to such a relationship at the time of the agreement. First, between February 1999 and July 2000, Hans Jecklin and Swiss advisors and partners associated with SLG took on an expanded role in the management and operations of SCGC. For example, an email from Mr. Brugger to John Tipton dated July 2, 2000 stated, "Any expense, small or large, has to be signed by you and one person from the Swiss side: Hans, Wolfgang, or myself." On January 18, 2000, SCGC purchased RAS2 using funds from a loan from SLG. Second, as a result of the NPA and subsequent transfers, SLG and JPC were directly enriched—JPC, as majority owner of SLG, was also enriched by any transfers to SLG. Third, the NPA was signed on August 3, 2000, by Tipton, after the email indicating that any expense had to be approved by "one person from the Swiss side." As of November 28, 2000, a few months after the NPA, the only officers of SCGC were John Tipton

and Gary Charters. Fourth, the contradictory minutes purporting to justify a $10 million transfer to Hans Jecklin, JPC, or SLG, are dated February 4, 2001, just six months after the NPA. They are signed by the Jecklins and not Tipton, although Tipton testified that he reviewed them and did not disapprove.

As discussed previously in this Order, Plaintiffs have raised a dispute as to an alter ego relationship between the Defendants and SCGC after the NPA as well as at the time of the NPA. These facts, and those reviewed above, raise a dispute as to an agency relationship between SLG, and JPC, acting through the "Swiss hot shots," and SCGC. In light of their subsequent enrichment, and of the concealment of any agency relationship with a foreign entity, such an agency would necessarily entail fraud and injustice.

The Court thus finds that Plaintiffs have raised a dispute as to "agency" liability. The Court further finds that Plaintiffs have not proven such a claim beyond dispute. Therefore, the claim will proceed to trial.

## VIII. THE BANKRUPTCY WAIVER

The individual defendants argue that they are entitled to summary judgment because "one of [Plaintiffs'] affiliates in the Resort at Summerlin Bankruptcy expressly released [them] for the claims raised in this action.

### A. Undisputed Facts

The Court finds the following facts to be undisputed. On March 8, 2002, RASI, RASLP, SCGC, SCRE and Wilmington Trust, in its capacity as collateral agent for the Lenders, entered into a binding settlement agreement arising out of the Resort at Summerlin Bankruptcy. The Settlement agreement provides in relevant part:

> **RECITALS . . . Parties: . . . 3.** Wilmington Trust Company ("Agent"), not in its individual capacity, but solely as collateral agent for certain lenders and successor by assignment from National Westminster Bank PLC which holds security interests in substantially all assets of the Debtors as provided by that certain Credit Agreement between the Debtors, certain lenders (the "Lenders"), …"

> 7(b) **Releases by Lenders.** Upon the Effective Date, Agent, on behalf of each and all of the Lenders, and each of their respective past and present affiliates, officers, directors (in

their representative and individual capacities), subsidiaries, partners, employees, predecessors, and successors, and each of them, shall and do hereby release and forever discharge the SCA Entities, the SCA Released Individuals listed on Exhibit "D" hereto, and their respective past and present subsidiaries, predecessors, and successors, from any and all claims, liabilities, demands, causes of action, debts, obligations, promises, acts, agreements, and damages; whether known or unknown, suspected or unsuspected, whether at law or at equity, which each Party ever had, now has, or may, shall or can hereafter have, arising out of or relating to the Actions, the Credit Agreement, the Bankruptcy Case, or the acquisition, development or financing of the Resort (the "Lenders' Released Claims"), save and except the Lenders' Released Claims shall not include those obligations (if any) arising under this Agreement or the Amended Litigation DIP Agreement.

Exhibit D lists the following Defendants: John Tipton, Hans Jecklin, Christiane Jecklin, and George Haeberling (all of the individual Defendants).

**Section 18 provides that "**[t]his Agreement shall be governed in all respects, including the validity, interpretation and effect, by the laws of the State of Nevada, without giving effect to the principles of conflicts of law thereof.

Testifying as the 30(b)(6) witness for Morgan Stanley, Joanna Anderson explained that she understood affiliate to mean "the entity with the – with some form of common ownership."

### B. Legal Standard

"Because a settlement agreement is a contract, its construction and enforcement are governed by principles of contract law. Basic contract principles require, for an enforceable contract, an offer and acceptance, meeting of the minds, and consideration. With respect to contract formation, preliminary negotiations do not constitute a binding contract unless the parties have agreed to all material terms. A valid contract cannot exist when material terms are lacking or are insufficiently certain and definite. A contract can be formed, however, when the parties have agreed to the material terms, even though the contract's exact language is not finalized until later. In the case of a settlement agreement, a court cannot compel compliance when material terms remain uncertain. The court must be able to ascertain what is required of the respective parties." May v. Anderson, 119 P.3d 1254, 1257 (Nev. 2005).

"A valid contract cannot exist when material terms are lacking or are insufficiently certain and definite." See Matter of Estate of Kern, 823 P.2d 275, 277 (Nev. 1991) (citing Richards v.

1 _Oliver_, 162 Cal. App. 2d 548, 552 (Cal. Ct. App. 1958) ("It is true, as urged by appellant, that the
2 courts will not uphold agreements which contain indefinite and uncertain provisions regarding
3 obligations upon the parties thereto . . . Contracts must be definite enough to enable the court to
4 ascertain what is required of the respective parties in the performance thereof."))

5      "An ambiguous contract is susceptible to more than one reasonable interpretation, and any
6 ambiguity, moreover, should be construed against the drafter." Am. First Credit Union v. Soro,
7 359 P.3d 105, 106 (Nev. 2015) (alteration and internal quotation marks omitted).

8      The parties agree that Nevada law does not define affiliate as it is used in this agreement.

10 ## C. Discussion

11      The Jecklin Defendants argue that the broad release language necessarily covers all of the
12 Plaintiffs in this action. Defendants assert that signatory Wilmington Trust signed as collateral
13 agent for Morgan Stanley Senior Funding, Inc., among others. The recitals nowhere indicate that
14 Morgan Stanley Senior Funding, Inc., is among the Lenders discussed. Defendant argues that
15 Morgan Stanley Senior Funding, Inc., and Morgan Stanley Investment Advisors, Inc. were
16 affiliates. Both were 100% owned by parent Morgan Stanley Dean Witter in 2002. Because
17 Morgan Stanley Investment Advisors, Inc. "controls" all of the Plaintiffs, all of the Plaintiffs are
18 affiliates of Morgan Stanley Senior Funding, Inc. However, Defendants appear to conflate
19 "control" and serving as an investment advisor.

20      Defendants emphasize that Avelar testified that in his capacity as an employee of Morgan
21 Stanley Investment Advisors, Inc., that he managed all the Plaintiffs. Joanna Anderson testified
22 that during 2002, Plaintiffs' operations were "managed" and "controlled" by Morgan Stanley
23 Investment Advisors, Inc.

24      Plaintiffs argue that they were not and are not affiliates of MS Senior Funding. There is no
25 common ownership between Plaintiffs and MS Senior Funding. The existence of a management
26 or advisory relationship does not make one entity an "affiliate" of another. Plaintiffs were all
27 investment funds owned by members of the investing public and governed by specific "investment
28 objectives, policies and restrictions" with which their boards of trustees or directors were

responsible for compliance. The only way to change an Investment Objective was by majority vote of the Plaintiff Funds' shareholders. To manage their day-to-day affairs, the Plaintiff Funds, by vote of their shareholders and boards of directors/trustees, hired an "investment advisor and administrator" on an annual basis. At all times MSIA reported to Plaintiffs' boards of directors/trustees and shareholders, and had no authority to depart from Plaintiffs' Investment Objectives.

Plaintiff argues that the release does not cover the NPA-based claims at issue here. Plaintiffs argue that the limiting language of the release—that it applies to actions or obligations "arising out of or relating to the Actions, the Credit Agreement, the Bankruptcy Case, or the acquisition, development or financing of the Resort"—does not encompass the NPA, which was a debt repurchase agreement that did not arise out of the "*acquisition, development, or financing* of the resort." The proceeds of the NPA, which would have been received by the funds, would never have been used to fund the resort. While the Release includes the "SCA (SCGC) entities," Defendants never raised this argument as to SCGC in the New York litigation as to the obligation under the NPA, and do not raise the validity of the underlying debt now. Nor was this argument raised in a motion to dismiss or prior motion in this case.

The Court finds that the Agreement is ambiguous both as to the definition of "affiliate" and as to the scope of claims covered as they relate to the "Actions" at issue, and that, read in light of the remainder of the agreement, as to what constitutes a claim or obligation that "arises out of the acquisition, development, or financing of the resort." As such the Court may consider extrinsic evidence. The Court finds that even if Defendants are not estopped or precluded from raising this argument, the failure to raise it over many years of litigation in this case, as well as in the New York litigation, places beyond dispute the limited intent with regard to this provision, and the fact that it does not cover the claims at issue here.

Moreover, "[i]n the case of a settlement agreement, a court cannot compel compliance when material terms remain uncertain. The court must be able to ascertain what is required of the respective parties." May v. Anderson, 119 P.3d 1254, 1257 (Nev. 2005). The Court finds that this directive, in conjunction with public policy concerns as to waiver by an affiliate of claims that will

substantially affect that assets of investment funds owing a fiduciary duty to the investing public, precludes Defendant's broad interpretation of the ambiguous provisions at issue. Moreover, there is no clear intent from the language of the contract or the extrinsic evidence as to the signatories to the contract that it would have the broad interpretation suggested by the Defendants. Such intent or meeting of the minds would be necessary for the enforcement sought by the Defendants. It does not exist here. Therefore, the settlement does not bar the relief sought in this case.

## IX. CONCLUSION

Accordingly,

**IT IS HEREBY ORDERED** that [231], [236], [239], and [321] Motions for Summary Judgment are GRANTED in part and DENIED in part as follows:

- All fraudulent transfer claims will proceed against the Jecklin Defendants, except for the transfers of $117,757.70 from SCRE on behalf of SCGC to Tipton on March 8, 2002; and of $71,292.73 from SCRE on behalf of SCGC to Tipton on July 16, 2002, which shall be dismissed against the Jecklin Defendants.

- All fraudulent transfer claims are dismissed against John Tipton, except for the transfers of $117,757.70 from SCRE on behalf of SCGC to Tipton on March 8, 2002; and of $71,292.73 from SCRE on behalf of SCGC to Tipton on July 16, 2002, which shall proceed against Defendant John Tipton.

- As agreed by the parties and stated on the record at the hearing on March 30, 2017, all fraudulent transfer claims against Defendant George Haeberling are dismissed.

- Theories of alter ego liability shall proceed against all Defendants.

- Theories of agency liability shall proceed against Defendants SLG and JPC.

**DATED** this <u>30th</u> day of April, 2018.

_____
**RICHARD F. BOULWARE, II**
**UNITED STATES DISTRICT JUDGE**