**UNITED STATES DISTRICT COURT**

**DISTRICT OF NEVADA**

* * *

| | |
|---|---|
| MORGAN STANLEY HIGH YIELD SECURITIES INC., *et al.*,<br><br>Plaintiffs,<br><br>v.<br><br>HANS JECKLIN, CHRISTIANE JECKLIN, GEORGE HAEBERLING, JOHN TIPTON, SWISS LEISURE GROUP AG, AND JPC HOLDING AG,<br><br>Defendants. | Case No. 2:05-cv-01364-RFB-PAL<br><br><u>ORDER</u><br><br>**Findings of Fact and Conclusions of Law After Court Trial** |

## I.    INTRODUCTION

This case is a veil-piercing action in which Plaintiffs seeks to enforce a judgment against Defendants that was entered against Seven Circle Gaming Corporation on December 18, 2003 in the United States District Court for the Southern District of New York. The Court held an eight-day bench trial in this case from April 30, 2018 through May 10, 2018. The Court rules in favor of Plaintiffs and against Defendant Hans Jacklin based on the following findings of fact and conclusions of law.

## II.    PROCEDURAL BACKGROUND

Plaintiffs filed the original Complaint on November 29, 2005. ECF No. 1. Plaintiffs asserted three counts: (1) Declaratory Judgment of Alter Ego Liability Against All Defendants, (2) Declaratory Judgment of Agency Liability Against Defendants Swiss Parents, and (3) Fraudulent Conveyance Against All Defendants. Id. The case was reassigned to this Court on October 20, 2016. ECF No. 431.

On March 31, 2017, the Court denied Plaintiffs' motion for summary judgment. ECF No. 443. The Court granted in part and denied in part Defendants' motion for summary judgment. Id. The Court dismissed two fraudulent transfer claims against Defendants Hans Jecklin and Christine Jecklin; all fraudulent transfer claims against Defendant John Tipton except the two transfers dated March 8, 2002 and July 16, 2002; and all fraudulent transfer claims against Defendant George Haeberling. ECF No. 545. Plaintiffs proceeded on the remaining fraudulent transfer claims as well as their theories of alter ego and agency liability. Id.

Following the bench trial that took place from April 30, 2018 to May 10, 2018, the Court took the matter under submission.

### III. JURISDICTION AND VENUE

This Court has diversity jurisdiction pursuant to 28 U.S.C. § 1332, as the parties are citizens of different states and the amount in controversy exceeds $75,000. Venue is proper because the incident from which this dispute arose occurred within Clark County, Nevada.

### IV. FINDINGS OF FACT

Federal Rule of Civil Procedure 52(a)(1) requires the Court to "find the facts specially and state its conclusions of law separately." Fed. R. Civ. P. 52(a)(1). The court must make findings sufficient to indicate the factual basis for its ultimate conclusion. Kelley v. Everglades Drainage District, 319 U.S. 415, 422 (1943). The findings must be "explicit enough to give the appellate court a clear understanding of the basis of the trial court's decision, and to enable it to determine the ground on which the trial court reached its decision." United States v. Alpine Land & Reservoir Co., 697 F.2d 851, 856 (9th Cir.), cert. denied, 464 U.S. 863 (1983) (citations omitted).

Accordingly, following the bench trial and having reviewed all of the evidence and observed all of the witnesses, the Court makes the following findings of fact in this case.

**A. The Parties**

1. Plaintiff Morgan Stanley High Yield Securities Inc. ("MSHYS") was, during the relevant time period, a corporation organized under the laws of Maryland.

2. The other six Plaintiffs—Morgan Stanley High Income Advantage Trust ("HIAT"), Morgan Stanley High Income Advantage Trust II ("HIAT II"), Morgan Stanley High Income Advantage Trust III ("HIAT III"), Morgan Stanley Diversified Income Trust, Morgan Stanley Variable Investment Series ("MSVIS"), and Morgan Stanley Select Dimensions Investment Series ("MSSDIS") (collectively with MSHYS, the "Plaintiff Funds" or "Funds")—were unincorporated business trusts organized under the laws of Massachusetts.

3. At all relevant times, the Plaintiff Funds were all investment funds owned by members of the investing public.

4. Defendant JPC Holding AG, formerly known as Tivolino Holding AG, ("JPC") is a Swiss corporation with its principal place of business located at Bahnhofstrasse 1, 8808 Pfäffikon, Zurich, Switzerland.

5. Defendant Swiss Leisure Group AG, formerly known as Swiss Casinos Holding AG, ("SLG") is a Swiss corporation with its principal place of business located at Bahnhofstrasse 1, 8808 Pfäffikon, Zurich, Switzerland.

6. Defendants Hans Jecklin and Christiane Jecklin are Swiss citizens, residing at Lindenstrasse 6, 8832 Wollerau, Switzerland.

7. Defendant George Haeberling is a Swiss citizen, residing in 6300 Zug, Switzerland.

8. Defendant John Tipton is a United States citizen, residing at 11633 La Mirago Place, Las Vegas, Nevada 89138.

**B. The Relationships Between Defendants and the Various Corporate Entities**

9. JPC was formed in 1975. Hans and Christiane Jecklin own 75% and 25% of JPC, respectively. Hans Jecklin was a director and board president between 1975 and 2009. Christiane Jecklin was a director between 1980 and 2009. Haeberling was a director between 1992 and 2002.

10. SLG is a holding company for JPC's gaming activities. Until 2001, JPC owned 100% of SLG. Hans Jecklin was a director between 1997 and 2002 and board president between 1998 and 2002. Christiane Jecklin was a director between 1998 and 2002. Haeberling was

a director between 1998 and 2002.

11. Seven Circle Gaming Company ("SCGC") is not a party to this case but is a judgment debtor to Plaintiffs. SCGC was formed in 1988 in Delaware and its principal place of business was in Delaware. It was formerly known as Swiss Casinos of America, Inc., and before that as Tivolino Holding (US), Inc. From 1997, SCGC operated in Las Vegas, Nevada.

12. SCGC was majority-owned by Defendant SLG. SLG's ownership of SCGC ranged from 82% in February 1997 to 98.8% in September 2001. Haeberling was a 1% shareholder at all relevant times. Tipton was a 3% shareholder between 1994 and 2000. The Jecklins did not own any shares of SCGC individually, but together owned 100% of JPC, which owned 100% of SLG, which owned a majority of SCGC.

13. The following Defendants were board members or officers of SCGC at some point. Hans Jecklin was a director from 1988 to 2006 and was the president, secretary, and treasurer from 2004 to 2006. Hans Jecklin was SCGC's sole officer from 2004 onwards. Christiane Jecklin was a director from 2000 to 2004. Haeberling was a director from 2000 to 2001. Tipton was a director from 1994 to 2004, president from 1999 to 2004, CEO from 2001 to 2002, CFO from 1994 to 2000, secretary and treasurer from 2000 to 2001, and general counsel from 1994 to 2004.

14. SCGC owned The Resort at Summerlin, Inc. ("RAS Inc."), The Resort at Summerlin, L.P. ("RAS"), Seven Circle Resorts Inc. ("SCR"), Seven Circle Real Estate Company ("SCRE"), and twelve other wholly-owned subsidiaries. Hans Jecklin, Christiane Jecklin, Haeberling, and Tipton served as board members and officers of these subsidiaries at different points during the relevant time period as well. These positions will be described in more detail as necessary.

**C. SCGC's Formation and Operations**

15. Hans Jecklin founded JPC in 1975. SLG became the holding company for all of JPC's gaming activities. By the early 2000s, SLG was Switzerland's largest casino operator. During the 1980s and 1990s, SLG invested in other gaming activities in Europe, including

- 4 -

in the Netherlands and Great Britain.

16. With the intention of investing in gaming activities in the United States, SLG created SCGC and incorporated it under the laws of Delaware in November 1988.

17. SLG initially owned 82% of SCGC and various minority shareholders owned the other 18%.

18. To fund SCGC, SLG contributed $50,000 in equity and loaned SCGC an additional $200,000.

19. Hans Jecklin then applied for and was granted a visa from the Immigration and Naturalization Services ("INS") to work in Maryland and reside there with Christiane Jecklin and their children.

20. In 1992, SCGC formed a wholly-owned subsidiary, Seven Circle Resorts, Inc. ("SCR"), which focused its efforts on developing and managing a casino in Colorado, managing a handful of casinos on Native American reservations, and pursuing possible gaming opportunities in Texas and Pennsylvania.

21. In 1994, SCGC's board of directors elected Tipton, who was already a director of SCGC, as its Vice President, Chief Financial Officer, and General Counsel.

22. Tipton held positions as President, CEO, CFO, Secretary, Treasurer, and General Counsel of SCR, and was an officer of SCR from 2000 through 2002.

23. SCGC also adopted expanded by-laws in 1993, which, *inter alia*, provided for the following:

- **Number of Directors.** "The board of directors, by resolution, may increase or decrease the number of directors from time to time. * * * [E]ach director shall be elected at each annual meeting of stockholders and shall hold such office until the next annual meeting of stockholders and until his successor shall be elected and shall qualify. No decrease in the number of directors shall have the effect of shortening the term of any incumbent director." (Article III § 1.)

- **Place of Board of Meetings.** "The regular or special meetings of the board of directors or any committee designated by the board shall be held at the principal office of [SCGC] or

at any other place * * * that a majority of the board of directors * * * may designate from time to time by resolution." (Article IV § 1.)

- **Notice of Special Board Meetings.** "[W]ritten notice of each special meeting of the board of directors * * * shall be given to each director * * * not less than one (1) day prior to the time fixed for the meeting. Notice of special meetings may be either given personally, personally by telephone, or by sending a copy of the notice through the United States mail or by telegram, telex or telecopy, charges prepaid, to the address of each director appearing on the books of the Corporation. * * * Neither the business to be transacted at, nor the purpose of, any regular or special meeting of the board of directors need be specified in the notice or waiver of notice of such meeting." (Article IV § 4.)

- **Informal Action by Directors.** "[A]ny action required * * * to be taken at any meeting of the board of directors * * * may be taken without a meeting if all members of the board * * * consent to the action in writing, and the written consents are filed with the minutes of proceedings of the board[.]" (Article IV § 9.)

- **Compensation of Officers.** "The compensation of * * * employees of [SCGC] may be fixed by the board of directors * * * or by an officer to whom that function has been delegated by the board." (Article V § 4.)

- **President.** "The president shall be the chief executive officer of [SCGC] and shall have general supervision of the business of [SCGC]." (Article V § 7.)

- **Delegation of Officers' Duties.** "Whenever an officer is absent, or whenever, for any reason, the board of directors may deem it desirable, the board may delegate the powers and duties of an officer to any other officer or officers or to any director or directors." (Article V § 11.)

24. The board members and officers of SCGC were familiar with these bylaws.

**D. Development of the Resort at Summerlin**

25. In 1996, SCGC began the development of the Resort at Summerlin, a luxury spa resort and casino in Las Vegas, Nevada.

26. In 1996, SCGC formed The Resort at Summerlin, Inc. ("RASI"), a wholly-owned

subsidiary of SCGC, which was the General Partner of The Resort at Summerlin, L.P. ("RASLP") (together with RASI, "RAS"), the entity responsible for the construction and management of the Las Vegas resort and casino that would be known as The Resort at Summerlin, and later the Regent Las Vegas (the "Resort").

27. Beginning at latest in June 1999 and continuing through at least May 2000, Hans Jecklin was a Director and Chairman of RASI.

28. Tipton was an officer and Director at RASI from the late 1990s until the fall of 2000.

29. The Resort at Summerlin was constructed in Summerlin, a master-planned community development just outside of Las Vegas.

30. The Howard Hughes Company ("Howard Hughes") owned six parcels that were zoned for gaming in Summerlin (the "Gaming Parcels").

31. The Gaming Parcels were among the few remaining pieces of property exempted from legislation passed by the Nevada legislature to restrict the development of local resort casinos/hotels.

32. In August 1996, SCGC's subsidiary, RASLP, purchased one (1) of the six (6) Gaming Parcels, a fifty-five acre property known as "RAS1" with funds from SCGC.

33. On the same day, RASLP and Howard Hughes entered into a royalty agreement, whereby RASLP agreed to pay Howard Hughes an annual royalty fee of $1,000,000 in exchange for, *inter alia*, the right to purchase the remaining five Gaming Parcels in the event that Howard Hughes determined to make the Gaming Parcels available for development ("Rights of First Offer").

34. Once RASLP had purchased RAS1, RAS raised $200 million in capital through a public offering, in addition to $144 million in funding from SCGC to fund construction of the Resort.

35. Specifically, in December 1997, after obtaining the requisite gaming licenses from the Nevada Gaming Commission, RAS raised $200 million by, *inter alia*, issuing $100 million in unsecured senior subordinated notes ("Senior Subordinated Notes").

36. In early 1998, Plaintiffs purchased approximately $40 million of the Senior Subordinated

Notes, which later became the subject of the August 2000 Note Purchase Agreement.

37. Specifically, with respect to the Senior Subordinated Notes, HIAT purchased $1,200,255, HIAT II purchased $1,801,980, HIAT III purchased $599,595, Morgan Stanley Flexible Income Trust purchased $3,904,290, MSVIS purchased $7,210,050, Morgan Stanley Select Dimension Investment Series purchased $299,265, and Morgan Stanley High Yield Services Inc. purchased $24,035,920.

38. In addition to the public debt financing, RAS also received investments through SCGC totaling approximately $144 million, which SCGC funded by borrowing $150 million from SLG.

39. SCGC borrowed money from SLG to fund investments in RAS because SCGC generated no significant revenue of its own.

40. SLG classified its investment in SCGC as a series of loans.

41. SCGC made some initial interest payments, but stopped paying interest to SLG in May 1999 because it did not have the funds to continue making interest payments.

42. As of March 31, 2000, SCGC's Consolidating Balance Sheet showed that its assets were approximately $44.7 million and its debts were approximately $124.8 million.

43. As of September 30, 2000, SCGC's Consolidating Balance Sheet showed that its assets were approximately $47.4 million and its debts were approximately $169.9 million.

44. A number of factors, including a major dispute with its general contractor, J.A. Jones, contributed to substantial construction delays of the Resort.

45. In August 1999, Hans Jecklin took the lead in all decision-making to turn around the project. Haeberling and Wolfgang Gross, SLG's CFO, began traveling regularly to Nevada to represent the interests of SLG.

46. Haeberling and Gross began advising the boards of SCGC and its subsidiaries regarding the Resort project.

47. SCGC and its subsidiaries reported many operational matters and project updates to Hans Jecklin, Tipton, and Haeberling.

48. In late 1999, Howard Hughes notified RAS that it was offering for sale a Gaming Parcel

known as "RAS2" for approximately $30 million, which required RAS to exercise, or decline to exercise, one of its Rights of First Offer.

49. RAS did not have the financial ability to purchase RAS2. RAS assigned its Right of First Offer to SCGC with the understanding that any interest or economic benefit obtained by SCGC from RAS2 would be shared with RAS. RAS retained the Rights of First Offer with respect to the four remaining Gaming Parcels.

50. Upon obtaining the Right of First Offer for RAS2, SCGC formed a wholly-owned subsidiary, Seven Circle Real Estate Company ("SCRE") for the sole purpose of purchasing RAS2.

51. On January 18, 2000, SCR, on behalf of SCRE, entered into an Agreement for the Purchase and Sale of Real Property with Howard Hughes, providing for the purchase of RAS2 for a total purchase price of $30,132,790.

52. Although construction of the Resort was only partially complete, it opened in June 1999 with the hope of generating enough revenue to meet its debt service obligations.

53. The opening, however, was not successful, and the Resort quickly fell short of revenue projections.

54. Defendants then began exploring options to restructure RAS's debt to avoid bankruptcy.

55. On August 3, 2000, Plaintiffs and SCGC signed the Note Purchase Agreement ("NPA"), pursuant to which SCGC would purchase Plaintiffs' Senior Subordinated Notes for $0.76 on the dollar, namely $29.7 million, on August 31, 2000. Tipton negotiated and signed the NPA on behalf of Swiss Casinos of America, n/k/a SCGC. Through several rounds of drafts, the buyer in the draft NPA was changed, initially from JPC to SLG, and subsequently, from SLG to SCGC.

56. Hans and Christiane Jecklin were directors of SCGC at the time the NPA was signed.

57. Haeberling was a director of SCGC and owned a 1.14% ownership interest in SCGC at the time the NPA was signed.

**E. Default on the Note Purchase Agreement**

58. As the closing date for the NPA approached, Defendants realized that their restructuring

plan, even if implemented, would not save RAS from bankruptcy.

59. Gross calculated that even with a successful restructuring of RAS's debt, which would include the purchase of Plaintiffs' notes on August 31, 2000, the Resort would still require an additional $108 million to continue operating.

60. While SCGC did not have sufficient cash to complete the NPA on August 31, 2000, it had assets of over $47 million as of September 30, 2000.

61. On August 30, 2000, Gross sent a memorandum to Hans Jecklin recommending that the Resort be abandoned and the NPA not be funded.

62. On September 1, 2000, SCGC directed its financial advisor, Salomon Smith Barney ("SSB"), to reverse funding of the NPA. SSB complied, breaching SCGC's obligations under the NPA.

63. On September 11, 2000, Plaintiffs' counsel sent a letter to SCGC stating that SCGC had defaulted on the NPA and demanding that they immediately comply with their obligations under the NPA.

**F. Post-Default Liquidation of Assets**

64. In the fall of 2000, Defendants decreased the board members of SCGC and its operating entity, SCR, to include only the four individual Defendants.

65. On September 6, 2000, SCGC elected Hans Jecklin, Tipton, and Haeberling as directors of SCR.

66. As of November 8, 2000, the Jecklins, Haeberling, and Tipton were SCGC's only board members, having eliminated non-Defendants Peter Meier (a director on the boards of SLG and JPC), Bud Hicks (a Nevada attorney), and Chris Brady (a Swiss businessman).

67. On November 14, 2000, SCRE sold the RAS2 property for approximately $42 million. This sale was negotiated by Tipton.

68. After paying off debts owed on the land, SCRE was left with approximately $15 million in cash of the $42 million proceeds of the sale.

**G. $946,335 Transfer to SLG**

69. On January 20, 2001, SLG's affiliate, SLG Holding Services AG, issued an invoice on

behalf of SLG to SCR in the amount of $946,335 for purported expenses, including $681,609 in consulting fees. The invoice did not include supporting documentation showing that any consulting work was performed or that SLG had paid any expenses. There was no actual consulting or expenses to justify this invoice.

70. On June 21, 2001, SCGC paid $946,335 to SLG.

71. On June 28, 2001, Wolfgang Gross instructed Gary Charters to book approximately $500,000 of the $946,335 "as an interest payment or capital repayment . . . . [w]hatever suits you better" to SLG from SCGC, and the remaining amount as a partial payment of an "Invoice for Management Services." No invoice for management services nor record of a loan from SLG to SCGC was provided. This instruction was intended to create an apparent legal justification for what was an unjustified transfer.

## H. $10 Million Transfer to Hans Jecklin

72. On February 9, 2001, SCRE transferred $10 million of the proceeds of the sale of RAS2 to Hans Jecklin's personal Swiss bank account.

73. Defendants recorded this transfer first as a personal loan of $10 million to Hans Jecklin, and later recharacterized the transfer as a loan repayment from SLG to UBS.

74. Tipton drafted SCRE board meeting minutes to reflect a purported SCRE board meeting that the Jecklins allegedly held on February 4, 2001, in which a single item of business was discussed: the authorization of a loan to Hans Jecklin. This meeting did not actually occur.

75. Hans and Christiane Jecklin signed the February 4, 2001 SCRE board minutes and Hans Jecklin faxed the signed minutes to Gary Charters, SCGC's CFO, on February 8, 2001 so that Charters could wire the $10 million to Hans Jecklin's personal Swiss bank account.

76. Entries were made in SCGC's financial records reflecting the $10 million loan to Hans Jecklin, and interest on the $10 million loan was manually calculated and entered into SCGC's accounting records on a contemporaneous basis each month through September 2001. These entries were created to provide an apparent legal justification for the transfer when there was none.

77. On November 1, 2001, RAS's pre-petition and post-petition lenders filed an *ex parte*

application to the Bankruptcy Court requesting an order that SCGC and SCRE produce, *inter alia*, documents reflecting "the transactions between SCGC and/or its affiliates and Debtors and/or their affiliates, and any matters which affect the administration of the estate."

78. On November 1, 2001, the Bankruptcy Court granted the application, ordering SCRE and SCGC to produce the requested documents on November 15, 2001.

79. On November 9, 2001, Defendants reversed all accounting entries reflecting the $10 million personal loan to Hans Jecklin and created new documentation for this transfer.

80. Instead of booking the $10 million transfer as a loan from SCRE, made on behalf of SCGC to Hans Jecklin, SCRE and SCGC altered their books and records to re-characterize the transfer as (i) a $10 million loan repayment by SCRE to SCGC and then (ii) a $10 million loan repayment by SCGC to SLG.

81. The revisions to the SCRE financial records on November 9, 2001 eliminated a $10 million receivable from Hans Jecklin on SCRE's balance sheet.

82. The justification for this revision was to allow SLG to repay a purported loan it owed UBS.

83. Tipton never saw any documentation verifying these alleged debts, but authorized the transaction regardless, simply based on his longstanding relationship with Hans Jecklin.

84. There was no legitimate business reason to transfer the $10 million to Hans Jecklin's personal bank account rather than directly to UBS except to effect a fraudulent transfer to Jecklin.

85. Sometime after the bankruptcy court ordered the disclosure of transactions between SCGC, SCRE, and their debtors on November 1, 2001, Tipton and the Jecklins drafted new sets of board minutes for SCRE, SCGC, and SCR ("Second Set of Board Minutes") to replace the First Set of Board Minutes prepared for SCRE in February 2001.

86. Hans and Christiane Jecklin signed the Second Set of Board Minutes.

87. The Second Set of Board Minutes state that the $10 million payment to Hans Jecklin was intended to ultimately repay UBS for funds that SLG had allegedly borrowed from UBS in connection with building the Resort.

88. These minutes, resolutions, and accounting records are not an amendment to, nor a correction of, the original First Set of Board Minutes and accounting records, nor do they reflect proceedings at a later board meeting.

89. The Second Set of Board Minutes fail to acknowledge or disclose that any portion of the $10 million would be retained by Hans Jecklin or used to cover expenses relating to the Jecklins' new private home in Switzerland.

90. The recharacterization of the $10 million transfer from a loan to Hans Jecklin to the repayment of a loan to UBS was not the result of a simple misunderstanding or miscommunication. It was an intentional post hoc effort to justify the transaction in a manner that avoided future financial obligations to Defendants' creditors.

**I. $1,325,000 Transfer to SLG**

91. On July 11, 2002, SCRE received a $1,484,003.90 settlement payment from insurance company Marsh Inc. in connection with unrelated litigation.

92. On July 12, 2002, Hans Jecklin directed Tipton to transfer $1.325 million from SCRE's account to SCGC's account for a purported interest payment to SLG.

93. On July 16, 2002, without board authorization or resolution, Tipton wired $1.325 million from SCR to SCGC and then from SCGC to SLG.

**J. $1,300,000 Transfer to JPC**

94. On January 31, 2002, SCGC received $1.8 million in connection with a settlement of certain claims related to debtor-in-possession litigation ("the DIP Litigation") undertaken by RAS during the bankruptcy.

95. On February 8, 2002, meeting minutes suggest that Hans and Christiane Jecklin held a series of board meetings in Zurich, exactly 15 minutes apart, for SCGC, SCRE and SCR. The minutes reflect that the Jecklins determined that SLG needed $1.3 million to begin making interest payments as quickly as possible on its outstanding debt. The Jecklins approved SCGC borrowing up to $3 million from SCRE and $1.5 million from SCR in order to make payments to SLG. There were no actual meetings.

96. On February 13, 2002, Christiane Jecklin directed Tipton to wire $1.3 million from SCGC

to JPC. On February 19, 2002, Tipton executed the transfer to JPC as a purported interest payment.

**K. $117,757.70 Transfer to Tipton**

97. On March 8, 2002, Tipton received $117,757.70 from SCRE on behalf of SCGC. This payment was in addition to Tipton's yearly salary of $325,000 and annual bonus of $100,000 and was characterized as an incentive payment.

98. Hans Jecklin authorized this payment. This payment was not raised or properly authorized at any SCGC board meeting or in any SCGC board resolution.

**L. $425,000 Transfer to JPC**

99. On March 11, 2002, SCGC transferred $425,000 of Fireman's Fund insurance premium returns to JPC. SCGC accounted for the transfer as an interest payment to SLG.

**M. $1,200,000 Transfer to JPC**

100. On May 14, 2002, SCRE received an additional $1.2 million from the settlement of claims in the DIP Litigation.

101. On May 17, 2002, SCRE transferred $1.2 million to SCGC, which transferred $1.2 million to JPC. SCGC accounted for the transfer as an interest payment to SLG.

**N. $71,292.73 Transfer to Tipton**

102. On July 16, 2002, Tipton received an additional $71,292.73 from SCRE on behalf of SCGC. This payment was in addition to Tipton's yearly salary and annual bonus and was characterized as an incentive payment. Hans Jecklin authorized this payment. This payment was not raised or properly authorized at any SCGC board meeting or in any SCGC board resolution.

103. At the time of all of these transfers and throughout the relevant time period in this case, Hans Jecklin knew and understood that he was engaging in sham or fraudulent transfers between the various entities that he controlled. He did so with the intent of withdrawing money from these entities without having to pay the debt or liabilities of these entities, especially SCGC. He intentionally directed the various entities to create fraudulent records and not follow the internal governance and by-laws of these entities.

## O. Hans Jecklin's Personal Expenses Paid with Corporate Funds

104.    Hans Jecklin used corporate funds to pay for numerous personal expenses, including family vehicles, personal staff, personal travel, educational expenses for his children, moving expenses, personal homes, renovations, and furnishings. The Court identifies the following examples, which do not constitute an exhaustive list.

105.    Hans Jecklin used $129,000 of SCGC's initial $250,000 in capital to renovate and furnish a 65-acre home in Royal Oak, Maryland ("Southerly Farm"). Southerly Farms was characterized as an SCGC office but was in fact a private holiday home.

106.    Hans Jecklin hired Helga Clark as a personal assistant and directed SCGC funds to provide her with a salary, retirement fund, and healthcare plan. Helga Clark performed personal services for Hans and Christiane Jecklin, including childcare for their six children. Helga Clark was characterized as SCGC's consultant but in fact never performed any work for SCGC.

107.    In 1998, SCGC and its subsidiaries purchased a home in Las Vegas ("Eagle Rock") for the Jecklins' personal use. SCGC and its subsidiaries also paid for moving expenses and a number of renovations to Eagle Rock, including landscaping and a pool. SCGC and its subsidiaries paid for Eagle Rock's monthly mortgage payments, telephone services, utilities, landscaping, and home association dues.

108.    Beginning in November 2000 and charged retroactively from January 1, 1999, SCR redundantly paid a monthly rent for Eagle Rock in addition to the mortgage.

109.    When Eagle Rock was sold in 2003, SCR wired all proceeds from the sale of Eagle Rock to the Jecklins' personal bank account. Neither SCGC nor SCR received any portion of these sale proceeds.

110.    Eagle Rock was exclusively a personal residence and was never used as a business address by SCGC or its subsidiaries.

111.    The board of directors of SCGC or any of its subsidiaries never authorized the payment of the mortgage on the Eagle Rock residence or any of the Eagle Rock-related payments described above.

112.    In October 2000, Haeberling instructed the Jecklins to divest themselves of any assets in the United States and recommended that they transfer Eagle Rock and their cars to their sons. Tipton was directed to prepare the legal papers necessary to conduct this transfer of assets.

113.    Of the $10 million transferred from SCRE to Hans Jecklin's personal Swiss bank account on February 9, 2001, Hans Jecklin spent $2.4 million on the construction of a private home in Switzerland.

114.    As the Jecklins prepared Eagle Rock for sale in 2002, Hans Jecklin used SCR funds to ship items from Las Vegas to the Jecklins' home in Switzerland and SCGC funds to pay for storage for items remaining in Nevada.

**P. New York Litigation**

115.    On August 6, 2001, Plaintiffs filed suit against SCGC for breach of the NPA in the District Court for the Southern District of New York (the "New York Litigation").

116.    On December 18, 2003, Judge Berman awarded Plaintiffs damages in the New York Litigation in the amount of $38,489,055, plus interest, finding that SCGC breached the NPA.

117.    SCGC did not pay the judgment.

**Q. Plaintiffs' Transfers of Interest**

118.    Current Plaintiffs HIAT, HIAT II, and HIAT III properly transferred their interests to current Plaintiff MSHYS on December 16, 2002. MSHYS then transferred its interests to Invesco High Yield Securities Fund on June 1, 2010. Invesco High Yield Securities Fund then transferred its interests to Invesco High Yield Fund on July 15, 2013.

119.    Also on June 1, 2010, current Plaintiff MSVIS transferred its interests to Invesco V.I. High Yield Securities Fund. Invesco V.I. High Yield Securities Fund then transferred its interests to Invesco V.I. High Yield Fund on April 29, 2013.

120.    On September 9, 2012, current Plaintiff MSSDIS transferred its interests to UIF Core Plus Fixed Income Portfolio, which has since changed its name to Morgan Stanley Variable Insurance Fund, Inc. Core Plus Fixed Income Portfolio.

# V. CONCLUSIONS OF LAW

## A. Substitution of Plaintiffs

Because current Plaintiffs HIAT, HIAT II, and HIAT III transferred their interests prior to this action and current Plaintiffs MSHYS, MSVIS, and MSSDIS transferred their interests during the pendency of this action, the Court grants Plaintiffs' Motion to Substitute Parties Pursuant to Fed. R. Civ. P. 25(c). ECF No. 529.

Rule 25(c) provides that "[i]f an interest is transferred, the action may be continued by or against the original party unless the court, on motion, orders the transferee to be substituted in the action or joined with the original party." Rule 17(a) provides that "[a]n action must be prosecuted in the name of the real party in interest." Rule 17(a) controls only where "an interest was transferred prior to the commencement of the suit," while Rule 25(c) "applies if the transfer occurs during the pendency of the action." Hilbrands v. Far E. Trading Co., 509 F.2d 1321, 1323 (9th Cir. 1975).

Here, the only transfer of interest that occurred prior to the commencement of the suit was the transfer of interest from HIAT, HIAT II, and HIAT III to MSHYS. The Court strikes HIAT, HIAT II, and HIAT III from the action under Rule 17(a), as they held no interest in the action upon commencement of the suit. The interests formerly held by these Plaintiffs were held entirely by MSHYS as of the commencement of the suit in 2005, and MSHYS was named as a Plaintiff at that time. All subsequent transfers of interest occurred five or more years after the commencement of the suit and are governed by Rule 25(c).

Therefore, pursuant to Rule 17(a), the Court strikes Plaintiffs HIAT, HIAT II, HIAT III. Pursuant to Rule 25(c): (1) Plaintiff MSHYS is replaced by Invesco High Yield Fund; (2) Plaintiff MSVIS is replaced by Invesco V.I. High Yield Fund; and (3) Plaintiff MSSDIS is replaced by Morgan Stanley Variable Insurance Fund, Inc. Core Plus Fixed Income Portfolio.

## B. Statute of Repose

The Court next addresses Defendants' arguments that Nevada Revised Statute ("NRS") 112.230 is a statute of repose not subject to equitable tolling and that, even if NRS 112.230 is not a statute of repose, Plaintiffs' claims are nevertheless time-barred.

The Court does not find that NRS 112.230 is a statute of repose and there is no Nevada authority to support such a finding. "In contrast to a statute of limitation, which forecloses suit after a fixed period of time following the occurrence or discovery of an injury, a statute of repose 'bar[s] causes of action after a certain period of time, regardless of whether damage or an injury has been discovered.'" Davenport v. Comstock Hills-Reno, 46 P.3d 62, 64 (Nev. 2002) (quoting Allstate Ins. Co. v. Furgerson, 766 P.2d 904, 906 n.2 (1988)). The Nevada Supreme Court, in explaining the history of its statutes of repose, has identified its statutes of repose as exclusively "three different sections" enacted in 1983: NRS 11.203, NRS 11.204, and NRS 11.205. G & H Assocs. v. Ernest W. Hahn, Inc., 934 P.2d 229, 231 (Nev. 1997). Recent cases concerning the statues of repose continue to identify only these three statutes. See, e.g., Dykema v. Del Webb Communities, Inc., 385 P.3d 977, 978 (Nev 2016); Anse, Inc. v. Eighth Judicial Dist. Court of State ex rel. Cty. of Clark, 192 P.3d 738, 745 n.29 (Nev. 2008). The Court does not find that Nevada Supreme Court has expressed any intention to expand the listing of statutes of repose.

As a policy matter, these statutes of repose exist to protect "the owner, occupier or any person performing or furnishing the design, planning, supervision or observation of construction, or the construction of an improvement to real property." Davenport, 46 P.3d at 64 (citing NRS 11.203(1), NRS 11.204(1), and NRS 11.205(1)). The purpose of such statutes is "to require trials of actions based upon *defects in construction* to be held within a relatively short time after the work is completed." Id. at 65 (quoting State Farm v. All Electric, Inc., 660 P.2d 995, 999 (Nev. 1983)). NRS 112.230 governs claims for relief with respect to fraudulent transfers or obligations, and Defendants offer no compelling reason for the Court to find that the policy rationale behind Nevada's statutes of repose extends to this drastically different context.

Because the Court finds that NRS 112.230 is not a statue of repose, the Court reiterates its discussion of equitable tolling in its April 30, 2018 order. ECF No. 545. Though the four-year statute of limitations ran approximately five months before this case was filed on November 15, 2005, the Court finds that a reasonable plaintiff in this matter may not have discovered the potentially fraudulent nature of the transfers until mid-2005 while conducting discovery in the

/ / /

- 18 -

New York litigation, as Plaintiffs allege is true in this case. Therefore, this Court applies equitable tolling principles and declines to dismiss on the basis of statute of limitations.

### C. Fraudulent Conveyances

Fraudulent transfers or conveyances are covered by NRS Chapter 112, the Uniform Fraudulent Transfer Act ("UFTA"). "The UFTA is designed to prevent a debtor from defrauding creditors by placing the subject property beyond the creditors' reach." Herup v. First Boston Fin., LLC, 162 P.3d 870, 872 (Nev. 2007).

Plaintiffs argue that the allegedly fraudulent transfers constitute violations of NRS 112.180(1). NRS 112.180 provides for two types of fraudulent transfers, often termed (a) fraud in fact and (b) constructive fraud. See Herup, 162 P.3d at 873 & nn.11–12. NRS 112.180 reads as follows:

> 1. A transfer made or obligation incurred by a debtor is fraudulent as to a creditor, whether the creditor's claim arose before or after the transfer was made or the obligation was incurred, if the debtor made the transfer or incurred the obligation: (a) With actual intent to hinder, delay or defraud any creditor of the debtor [**Fraud in fact**]; or (b) Without receiving a reasonably equivalent value in exchange for the transfer or obligation, and the debtor: (1) Was engaged or was about to engage in a business or a transaction for which the remaining assets of the debtor were unreasonably small in relation to the business or transaction; or (2) Intended to incur, or believed or reasonably should have believed that the debtor would incur, debts beyond his or her ability to pay as they became due [**Constructive fraud**].

NRS 112.180(2) outlines factors to consider in an analysis of fraud in fact:

> 2. In determining actual intent under paragraph (a) of subsection 1, consideration may be given, among other factors, to whether: (a) The transfer or obligation was to an insider; (b) The debtor retained possession or control of the property transferred after the transfer; (c) The transfer or obligation was disclosed or concealed; (d) Before the transfer was made or obligation was incurred, the debtor had been sued or threatened with suit; (e) The transfer was of substantially all the debtor's assets; (f) The debtor absconded; (g) The debtor removed or concealed assets; (h) The value of the consideration received by the debtor was reasonably equivalent to the value of the asset transferred or the amount of the obligation incurred; (i) The debtor was insolvent or became insolvent shortly after the transfer was made or the obligation was incurred; (j) The transfer occurred shortly before or shortly after a substantial debt was incurred; and (k) The debtor transferred the essential assets of the business to a lien or who transferred the assets to an insider of the debtor.

Under Nevada law, "transfer" means "every mode, direct or indirect, absolute or conditional, voluntary or involuntary, of disposing of or parting with an asset or an interest in an asset, and includes payment of money, release, lease and creation of a lien or other encumbrance." Nev. Rev. Stat. § 112.150.12.

### i. $10 Million Transfer to Hans Jecklin

The Court finds that the transfer of $10 million from SCRE to Hans Jecklin on February 8, 2001 constitutes fraud in fact in violation of NRS 112.180(1)(a). Hans Jecklin personally approved the transfer of the corporate funds to his own Swiss bank account, then participated in the strategic alteration of records to falsely represent the transfer as a loan repayment, including redrafting board minutes and changing the books. The Court finds that Hans Jecklin intentionally doctored these records to conceal the funds and to avoid his financial obligations to Plaintiffs.

The Court also finds that the transfer constitutes constructive fraud in violation of NRS 112.180(1)(b). The notion that the $10 million was a repayment of a loan wired through Hans Jecklin's personal account for expediency is false, and the Court finds a lack of consideration for the transfer. SCGC's remaining assets were unreasonably small in relation to the transaction. SCGC was functionally insolvent, as its debts far exceeded its assets at the time of this transfer.

### ii. $946,335 Transfer to SLG

The Court finds that the June 21, 2001 transfer of $946,335 from SCGC to SLG constitutes fraud in fact in violation of NRS 112.180(1)(a). The invoice issued on behalf of SLG was a fraudulent invoice without actual support and was generated to create the appearance of a legitimate transfer. The Court finds that these funds were intentionally transferred to deplete SCGC of cash and hinder efforts to collect on SCGC's debt.

The Court also finds that the transfer constitutes constructive fraud in violation of NRS 112.180(1)(b). The Court finds that the transfer was not made for reasonably equal consideration. SCGC continued to be insolvent at this time: SCGC's June 2001 balance sheet indicates that its liabilities exceeded its assets by over $180 million.

### iii. $1,325,000 Transfer to SLG and $1,300,000 Transfer to JPC

The Court finds that the transfers of $1.3 million from SCGC to JPC on February 19, 2002 and of $1.325 million from SCRE to SCGC to SLG on July 16, 2002 constitute fraud in fact in violation of NRS 112.180(1)(a). At the Jecklins' direction, Tipton enacted these transfers and recorded them as interest payments without actual interest being due and without SCGC board approval. The Court finds that Hans Jecklin and Tipton intentionally transferred large portions of incoming settlement payments in an attempt to insulate these funds from Plaintiffs' collection efforts.

The Court also finds that the transfers constitute constructive fraud in violation of NRS 112.180(1)(b). The Court finds that there was no reasonably equivalent value exchanged. SCGC remained functionally insolvent at the time of the transfers.

iv. $117,757.70 and $71,292.73 transfers to Tipton

The Court finds that the March 8, 2002 and July 16, 2002 transfers to Tipton from SCRE on behalf of SCGC constitute fraud in fact in violation of NRS 112.180(1)(a). These transfers were pursuant to an agreement between only Hans Jecklin and Tipton and were not approved by the SCGC board. Even though SCGC was functionally insolvent at that time, Tipton received these funds in addition to his salary and his annual bonus. In light of SCGC's debts and the failure to obtain board approval for these transfers, these extraneous payments to Tipton demonstrate an intent to keep funds from Plaintiffs while compensating Tipton beyond the value of his work and in exchange for his assisting with the fraudulent transfers.

The Court also finds that the transfers constitute constructive fraud in violation of NRS 112.180(1)(b). Though Tipton conducted work on the DIP litigation and performed other services in his positions with SCGC and SCR, the Court finds that Tipton was sufficiently compensated by his $325,000 annual salary and $100,000 annual bonus. The Court finds that these payments were not reasonable compensation for the value of additional work. They were provided in exchange for Tipton to assist with the fraudulent transfers. Additionally, as above, SCGC was functionally insolvent at the time and was professing its inability to compensate Plaintiffs in the New York litigation.

v. $425,000 Transfer to JPC and $1,200,000 Transfer to JPC

The Court finds that the March 11, 2002 transfer from SCGC to JPC and the May 14, 2002 transfer from SCRE to SCGC to JPC constitute fraud in fact in violation of NRS 112.180(1)(a). These transfers are each recorded as interest payments to SLG, even though in both cases JPC was the entity that received the funds. The Court finds that these payments were not made for a proper purpose and evince an intent to continue to keep SCGC devoid of cash so that it could not be compelled to pay its debts.

The Court also finds that the transfers constitute constructive fraud in violation of NRS 112.180(1)(b). The Court finds that these funds were not provided as part of an equivalent exchange of value. SCGC remained functionally insolvent at this time.

### D. Alter Ego Liability

"Nevada has long recognized that although corporations are generally to be treated as separate legal entities, the equitable remedy of 'piercing the corporate veil' may be available to a plaintiff in circumstances where it appears that the corporation is acting as the alter ego of a controlling individual." LFC Marketing Group, Inc. v. Loomis, 8 P.3d 841, 845 (Nev. 2000). "Indeed, the 'essence' of the alter ego doctrine is to 'do justice' whenever it appears that the protections provided by the corporate form are being abused." Id. at 845-46.

To find alter ego, Plaintiffs must establish three elements by a preponderance of the evidence:

> (1) the corporation must be influenced and governed by the person asserted to be the alter ego; (2) there must be such unity of interest and ownership that one is inseparable from the other; and (3) the facts must be such that adherence to the corporate fiction of a separate entity would, under the circumstances, sanction fraud or promote injustice."

Polaris Indus. Corp. v. Kaplan, 747 P.2d 884, 886 (Nev. 1987). Though there is no litmus test or conclusive factor, "[s]ome factors to be considered when determining if a unity exists in an alter ego analysis include, but are not limited to, commingling of funds, undercapitalization, unauthorized diversion of funds, treatment of corporate assets as the individual's own, and failure to observe corporate formalities." Lorenz v. Beltio, Ltd., 963 P.2d 488, 497 (Nev. 1998). However, "the circumstances of each case and the interests of justice should control." LFC Marketing Group, 8 P.3d at 905 (internal quotation marks omitted).

i. <u>Hans Jecklin</u>

The Court finds that Hans Jecklin was an alter ego of SCGC, and of all the entities over which he had control, throughout the relevant time period.

First, the Court finds that SCGC was influenced and governed by Hans Jecklin. Hans Jecklin had a majority ownership interest in SCGC (through his 75% ownership of JPC, JPC's 100% ownership of SLG, and SLG's 82% to 98.8% majority ownership of SCGC). He served as the director from 1988 to 2006 and the president, secretary, and treasurer from 2004 to 2006. The Court finds that Hans Jecklin exhibited significant influence and decision-making power on SCGC's behalf throughout all relevant events, particularly as of August 1999 when he took the decision-making lead on the project to build the Resort.

Second, the Court finds a unity of interest and ownership between Hans Jecklin and SCGC. Several factors inform the Court's decision. The Court finds an abject failure to observe corporate formalities in this case. The various entities owned in whole or in majority part by Hans Jecklin operated as if they were a single entity—an entity controlled by Jecklin. The Court also finds that Hans Jecklin treated corporate assets as his own. Multiple transactions discussed above occurred at Hans Jecklin's direction and without proper paperwork or verification. The $10 million transaction was transferred directly to Hans Jecklin's personal Swiss bank account without appropriate documentation or consideration, and Hans Jecklin engaged in post hoc efforts to legitimize the transfer on paper.

Third, the Court finds that adherence to the corporate fiction of a separate entity would sanction fraud in this case. As discussed above, Hans Jecklin personally benefited from several fraudulent transfers, most notably the $10 million direct transfer, of which Hans Jecklin spent $2.4 million on construction of a private home. Hans Jecklin routinely used corporate assets for personal purposes, including family vehicles, personal staff, personal travel, moving expenses, personal homes, renovations, and furnishings. When it became clear that the Resort construction project would fail, Hans Jecklin engineered a series of transfers to ensure that SCGC remained insolvent and incapable of paying its debts.

/ / /

The Court finds that Plaintiffs have established the three factors under the alter ego test and that justice militates a finding that Hans Jecklin was an alter ego of SCGC. Therefore, the Court finds that Hans Jecklin may be held personally liable for SCGC's debts to Plaintiffs.

### ii. Christiane Jecklin

The Court finds that Christiane Jecklin was not an alter ego of SCGC at any time.

Christiane Jecklin was a partial owner of JPC and therefore a partial owner of SLG and SCGC. She signed off on several business decisions and transfers that this Court has found to be fraudulent, including the $10 million transfer to Hans Jecklin's personal account. However, the Court finds her denials as the true intent of the transfers to be credible. Christiane Jecklin was unaware of the improper comingling of funds between the corporates and her family's personal finances; she believed that she and Hans Jecklin were paying for their family's expenses privately. Christiane Jecklin was minimally involved and informed as to the operations and expenses of the various relevant entities. While she was an owner and board director on paper, she did not sufficiently influence and govern SCGC to satisfy the first factor of the alter ego test. Moreover, because of her minimal involvement and lack of personal culpability, adherence to the corporate fiction as applied to Christiane Jecklin would not promote injustice.

### iii. John Tipton

The Court does not find that Tipton was an alter ego of SCGC throughout the relevant time period.

First, the Court finds that Tipton exerted sufficient influence and governance over SCGC. Tipton was a director of SCGC from 1994 to 2004, president from 1999 to 2004, CEO from 2001 to 2002, CFO from 1994 to 2000, secretary and treasurer from 2000 to 2001, and general counsel from 1994 to 2004. Tipton signed the NPA and negotiated the sale of RAS2. As one of only a few corporate actors in Hans Jecklin's innermost circle, Tipton had nearly unparalleled authority within SCGC after Hans Jecklin himself.

Second, however, the Court does not find a unity of interest between Tipton and SCGC. While Tipton assisted Hans Jecklin with the creation of records for which he knew there was no support, the Court does not find sufficient evidence that there was a unity of interests between

Tipton himself and SCGC. While Tipton exercised incredibly poor judgment in the creation of the false records, the Court does not find that his actions demonstrate a unity of his own interests with that of SCGC. Moreover, the Court does not find that it would be just to hold Tipton financially accountable for SCGC's debts. Therefore, the Court does not find alter ego liability as to Tipton.

### iv. George Haeberling

The Court finds that Haeberling was not an alter ego of SCGC at any time. Though his participation satisfies the first factor of the alter ego test, it does not satisfy the second and third.

The Court finds that Haeberling exerted sufficient influence and governance over SCGC during his time as a director. Haeberling helped oversee SCGC's United States operations, traveled to Las Vegas regularly, led several SCGC board meetings, and advised Hans Jecklin at several critical junctures, including instructing the Jecklins to divest themselves of any assets in the United States and to transfer Eagle Rock and their cars to their sons to protect these assets from SCGC creditors. Like Tipton, Haeberling operated within Hans Jecklin's innermost circle.

The Court, however, does not find a unity of interest between Haeberling and SCGC. While much of Haeberling's advice was specifically engineered to protect Hans Jecklin from alter ego liability, his conduct and the record do not support a finding that there was a unity of his own interests with that of SCGC. Moreover, the Court does not find that it would be just to hold Haeberling financially accountable for SCGC's debts. Therefore, the Court does not find alter ego liability as to Haeberling.

### v. SLG & JPC

The Court finds that SLG and JPC were alter egos of SCGC throughout the relevant time period. Until 2001, JPC owned 100% of SLG, and SLG owned between 82% and 98.8% of SCGC. The same directors and decision-makers – primarily Hans Jecklin – governed all three entities and treated them as one. Therefore, the governance and unity of interest factors on the alter ego test are easily satisfied.

Additionally, adherence to the corporate fiction of three separate entity would sanction fraud. All of the fraudulent transfers discussed above, with the exception of the two bonuses to

Tipton, benefited either SLG or JPC. Both SLG and JPC can be held financially liable to Plaintiffs for debts incurred by SCGC.

## VI.    JUDGMENT

The Court finds in favor of Plaintiffs on their fraudulent conveyance claims under NRS 112.180(1) as to Defendants Hans Jecklin, SLG, and JPC. The Court issues declaratory judgment that Hans Jecklin, SLG, and JPC are legally alter egos of SCGC and can be held financially liable to Plaintiffs for debts incurred by SCGC. The Court awards Plaintiffs the full amount of the SDNY judgment, plus post-judgment interest, costs, and attorney's fees.

**IT IS ORDERED** that [529] Plaintiffs' Motion to Substitute Parties Pursuant to Fed. R. Civ. P. 25(c) is GRANTED.

**IT IS FURTHER ORDERED** that [587] Motion for Judgment on Partial Findings is DENIED as moot.

**IT IS FURTHER ORDERED** that [604] Motion for Leave of Court to File Notice of Supplemental Authority is GRANTED.

**IT IS FURTHER ORDERED** that the Clerk of Court shall enter judgment for Plaintiffs against Defendants Hans Jecklin, SLG, and JPC in the full amount of the SDNY judgment, plus post-judgment interest, costs, and attorney's fees. The Clerk of Court shall enter judgment in favor of Defendants Christiane Jecklin, John Tipton, and George Haeberling. The Clerk of Court is instructed to close this case.

**DATED:** March 31, 2019.

 

_____
**RICHARD F. BOULWARE, II**
**UNITED STATES DISTRICT JUDGE**